723 A.2d 111 (1999)
318 N.J. Super. 175
STATE of New Jersey, Plaintiff-Respondent,
v.
Anthony CARDELL, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 12, 1999.
Decided February 10, 1999.
*112 Paul B. Halligan, Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Halligan, of counsel and on the brief).
Michael J. Williams, Deputy Attorney General, for plaintiff-respondent (Peter Verniero, Attorney General, attorney; Mr. Williams, of counsel and on the brief).
Before Judges KEEFE, EICHEN, and COBURN.
The opinion of the court was delivered by COBURN, J.A.D.
A jury convicted defendant Anthony Cardell of fourth-degree stalking, N.J.S.A. 2C:12-10. The trial judge, taking into account defendant's nine prior convictions, sentenced him to prison for eighteen months, nine months to be served without parole. We affirm.
Defendant's primary contentions are: (1) the anti-stalking statute is unconstitutionally overbroad and vague; and (2) his motion for acquittal under R. 3:18-1 should have been granted because the evidence was insufficient to support the verdict.

I.
This forty-three-year old defendant's first contact with the eighteen-year old victim, Mandi Peterson, occurred on September 26, 1996. She had just emerged from her place of employment, the Playdrome Bowling Center on Route 37 in Toms River, where she worked as a waitress. It was at the end of her usual work day, somewhere between midnight and 2 a.m.
He was seated in a distinctively marked pickup truck in the parking lot. He opened the brief discussion by asking her to "have sex with him" or "give him head" for $50 in cash or for some freshly cut cocaine. She politely but firmly refused, got in her car, and began driving home. She watched as he followed her in his truck for approximately three miles, until she turned from Route 37 onto Vaughn Avenue.
On the following evening between 7 p.m. and 9 p.m., defendant called the Playdrome. The call was answered by another employee. Mandi picked up an extension and heard defendant ask for her by her full name, which frightened her since he was a stranger. He also said, "If she doesn't understand who I am or she doesn't get on the phone right now, I will make sure I catch up with her later." Mandi said, "I can't hear you, sorry," and hung up. The phone rang again. Mandi picked it up and said, "Sorry. You have the wrong number," and hung up. Moments later, he called again. This time she heard the defendant say, "Mandi, this is Tony." When she said she did not know who he was, he replied, "You have to know who I am. I'm the one that you need to take up my offer." (Emphasis added.) She said she could not hear him, that he had the wrong person, and she hung up. When she left work sometime after midnight, she saw defendant in his truck, which was parked in the same place as the previous night. He asked her to take him up on his offer. She replied, "No. Yesterday I said, `No.'" She walked back into the Playdrome, thinking that he might leave. He drove away after a few seconds, but when she began her drive home, she saw him waiting at the entrance of the *113 almost adjacent K-Mart, ready to pull out. On this occasion he followed her for only a short distance.
The next evening when she left work, defendant again followed her in his truck as she drove towards home from the Playdrome. On this occasion, he continued behind her after she turned onto Vaughn Avenue, following her until she pulled into the driveway of a stranger's house on Holly Village Lane, which was a block from her house. After she turned her lights off, hoping that he would incorrectly believe this was where she lived, he drove away and then she went home.
On the following evening around midnight, Mandi parked her car in the Playdrome parking lot so that she could speak briefly to her boyfriend, who was inside. When she emerged about a minute later, she noticed that her car had been dented on the driver's side door.
The next contact occurred on Monday, September 30. At about 11:30 p.m., a fellow employee told her that he had seen the defendant parked outside the Playdrome behind the dumpsters, apparently waiting for her. When she drove home a little later, she decided to turn onto Adams Avenue, her usual turn-off point from Vaughn. As she drove onto Adams, she saw the defendant standing beside his truck, and as she passed he said, "I seen someone went boom boom to your car."
The next evening, Mandi repeatedly heard the distinctive sound made by defendant's truck as he drove around the Playdrome parking lot. Before leaving work, she had friends check the lot to be sure he was not there. They did not see him, but immediately after Mandi turned on her car's ignition, she heard defendant start his truck. She sounded the car's horn. As two of her friends ran toward her from the Playdrome, she saw defendant drive from a lot across the road where he had been parked behind some large trucks. He made a quick turn and drove very slowly past where she was then standing with her friends. Mandi went back into the Playdrome and called the police. They arrived promptly, took a statement detailing the past events, and searched the area for the truck without success. Nonetheless, when Mandi drove home at about 2 a.m., the defendant appeared again and followed her for about five blocks to her home. She called the police immediately. Within minutes, they found the defendant in his truck on Route 37 just east of Vaughn Avenue. Defendant lived in Seaside Park.
Mandi testified that the episodes involving this defendant were extremely distressing and placed her in great fear of physical injury.

II.
In State v. Saunders, 302 N.J.Super. 509, 695 A.2d 722 (App.Div.), certif. denied, 151 N.J. 470, 700 A.2d 881 (1997), we sustained New Jersey's original anti-stalking statute, L. 1992, c. 209,[1] against claims that it was unconstitutionally overbroad and vague. By then the Legislature had amended the statute. *114 L. 1996, c. 39, effective June 20, 1996.[2] Since Cardell's offense began in September 1996, the new statute applied to him.

A.

OVERBREADTH
As we observed in Saunders, supra, "Overbreadth is a doctrine ... that addresses the statute's reach but not its clarity." 302 N.J.Super. at 518, 695 A.2d 722. The test for determining overbreadth is whether the statute substantially restricts constitutionally protected conduct. Id. at 519, 695 A.2d 722. Although there are differences between the original and the amended statute, none of the differences noted by Cardell substantially bear on this issue and make the present statute overbroad. Therefore, based on Saunders`s sound resolution of the issue, we reject the contention that the present statute is overbroad. Nonetheless, we will briefly address Cardell's specific points directed at what he perceives as significant differences between the two laws.
Cardell argues the present statute is overbroad, limiting his First Amendment rights to freedom of speech, association, and assembly, because, while it continues the exemption for "organized group picketing," it does not contain the following provision found in the original act: "Constitutionally protected activity is not included within the meaning of `course of conduct.'" L. 1992, c. 209, § a(1).
That vaguely expressed exception from the original statute's reach added nothing of substance. Nonetheless, defendant contends that its absence from the present act has the effect of conditioning the exercise of First Amendment rights on membership in an organized group involved in picketing. Nowhere does defendant explain how this inference can be drawn from the statute. In fact, it cannot. Whatever the particular protection of picketing might mean, it certainly does not follow from it that the constitutional rights of people not involved in organized picketing are somehow lessened by that protection's presence in the statute. The reach of the statute must be judged on what it expressly prohibits. Anyone exercising first amendment rights, whether in organized groups or otherwise, cannot be convicted under the statute "even without any specific exception." McDade v. State, 693 A.2d 1062, 1065 (Del.1997).
Next, Cardell argues that the statute is too broad because of its definition of "course of conduct" in subsection a(1). He contends that subsection's references to "maintaining a visual or physical proximity to a person" and to "conveying verbal threats" would unduly *115 restrict his ability to go where he wishes and to say what he wants to say.
But these phrases cannot be considered in isolation from the balance of the statute, which clearly limits its reach in the following manner. Subsection a(1) specifies that the speech or conduct be "directed at or toward a person." Subsection a(2) requires that the speech or conduct occur on at least two occasions. Subsection b(1) requires that a defendant "purposely" engage in the course of conduct and, more specifically, defines the nature of the prohibited activity by stating that it must be capable of causing "a reasonable person to fear [for himself or his immediate family] bodily injury ... or death." And subsection b(2) requires the defendant to have "knowingly, recklessly or negligently"[3] caused a "reasonable fear" of bodily injury or death.
Those restrictions on the breadth of the statute are clearer and greater than the restrictions contained in the original statute, which we have sustained as not overbroad. For example, under the original statute a defendant could be guilty if his intent was merely to annoy the victim. L. 1992, c. 209, § b. Now, a reasonable fear of bodily injury (obviously as defined in N.J.S.A. 2C:11-1a) or death is required. N.J.S.A. 2C:12-10b(2). Also, under subsection a(1) of the original statute the course of conduct was condemned if it would cause a reasonable person to suffer "emotional distress." L. 1992, c. 209, § a(1). That arguably more extensive phrase has been eliminated, and instead, the statute requires reasonable fear of bodily injury or death.
We also reject defendant's contention that the new statute is overbroad because it has substituted for specific intent to annoy or place in reasonable fear of bodily injury or death the concept of purposely engaging in conduct aimed at a specific person that would cause a reasonable person to fear bodily injury or death. That is not to say that the new statute is not somewhat broader. Under it, a defendant can no longer defend by saying that however outrageous his conduct might have been, it was not his actual intent to cause the requisite fear. But this additional and important protection to victims only incrementally increases the reach of the statute; it does not wrongly extend that reach to "`a substantial amount of constitutionally protected conduct.'" State v. Mortimer, 135 N.J. 517, 530, 641 A.2d 257 (quoting Houston v. Hill, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L. Ed.2d 398, 410 (1987)), cert. denied, 513 U.S. 970, 115 S.Ct. 440, 130 L. Ed.2d 351 (1994).
Few, if any, rights are as precious to Americans as those contained in the First Amendment to our Federal Constitution, but that great Amendment is not a refuge against criminal laws that do not restrict our protected freedoms. In short, there is no constitutional right to threaten other people in the manner prohibited by our anti-stalking statute. See, e.g., Salt Lake City v. Lopez, 935 P.2d 1259, 1262-65 (Utah Ct.App.1997) (rejecting an overbreadth challenge to its stalking statute, a law that in all relevant regards tracks the provisions of our present statute.)

B.

VAGUENESS
The defendant also argues that the anti-stalking statute is unconstitutionally vague on its face and as applied to his conduct in this case. His argument again focuses on the phrase "repeatedly maintaining a visual or physical proximity" to the victim.
In essence, he complains that the phrase fails to inform how close one must get to be in violation of the law.
In State v. Saunders, supra, we also considered a vagueness challenge to the original statute. 302 N.J.Super. at 520-23, 695 A.2d 722. The defendant had argued that the word "following" was unduly vague. We rejected that contention, concluding that a person of ordinary intelligence would understand that it included deliberately and repeatedly traveling to a location where another person routinely goes to watch that person. Id. at 522, 695 A.2d 722.
*116 The present statute substitutes for "following" the phrase in question"repeatedly maintaining visual or physical proximity to a person." There is no significant difference between these concepts. Moreover, although we did not rule on the constitutionality of the present statute in Saunders, we did say that its substitute for "following" was not unduly vague:
[T]he new language in the statute outlaws specific conduct, such as "repeatedly maintaining a visual or physical proximity to a person" or "written threats or threats implied by conduct." ... [W]e note that the amended statute is not unconstitutionally vague based on defendant's argument. It is clear what type of conduct is proscribed.
[Id. at 523, 695 A.2d 722 (citations omitted).]
Therefore, based on the holding of Saunders, reinforced by its dictum addressing the phrase in question, we are satisfied that defendant's vagueness argument lacks substance.
Defendant also alludes, as he did in his overbreadth argument, to the difference between the original statute and the present statute on the issue of intent. Instead of requiring proof that a defendant specifically intended to cause fear of bodily injury or death, L. 1992, c. 209, § b, the present statute requires that defendant purposely engage in the defined course of conduct in a manner that would cause a reasonable person to fear bodily injury or death, N.J.S.A. 2C:12-10b(1). In addition, the present statute requires proof that a defendant knowingly, recklessly, or negligently placed the victim in reasonable fear of bodily injury or death, N.J.S.A. 2C:12-10b(2).
In Saunders, supra, after rejecting the vagueness claim, the court added: "Moreover, defendant's contention that the stalking statute is vague fails because the statute requires a specific intent." 302 N.J.Super. at 522, 695 A.2d 722. Defendant contends it was the original statute's requirement of specific intent that moved the Saunders court to hold that the statute was not unconstitutionally vague. Actually, the presence of specific intent was simply an additional reason for the result, not its sole basis. Id. at 522-23, 695 A.2d 722. In any case, we perceive no difference from a constitutional point of view between the different forms of intent required by these statutes.
In adopting a general intent standard, our Legislature accepted the approach suggested by the National Institute of Justice, which drafted a model anti-stalking statute [4] at the request of the Attorney General, pursuant to the direction of Congress. Christine B. Gregson, Comment, California's Antistalking Statute: The Pivotal Role of Intent, 28 Golden Gate U.L.Rev. 221, 242 (1998).
The [National Institute of Justice] published the Model Code as an example of antistalking legislation that would protect the rights of both stalkers and victims, as well as withstand constitutional scrutiny. The drafters of the Model Code believed that a general intent standard was preferable to a specific intent standard because it forces the criminal justice system to focus on the behavior of the accused stalker, rather than on his motivation. This ensures that people who purposefully engage in stalking behavior do not escape liability because they did not specifically intend to cause the victim to be afraid, even if the victim's fear was the probable and knowable *117 consequence of the accused stalker's actions.

[Id. at 262-63.]
The purpose of a specific intent requirement is to "clarify" other phrases of the statute that might be considered vague. State v. Mortimer, 135 N.J. 517, 536, 641 A.2d 257, cert. denied, 513 U.S. 970, 115 S.Ct. 440, 130 L. Ed.2d 351 (1994); State v. Finance American Corp., 182 N.J.Super. 33, 40-41, 440 A.2d 28 (App.Div.1981). The mental state requirements of the present act, though more general, fully satisfy that need, as has been recognized, for example, by Lopez, supra, 935 P.2d at 1265; and State v. Ruesch, 214 Wis.2d 548, 571 N.W.2d 898, 904, 905 (Wis.Ct.App.1997), both cases upholding statutes like our own against vagueness challenges.
Our legislation, paralleling as it does the critical provisions of the Model Code, fully protects a defendant's constitutional rights by avoiding any suggestion of vagueness that might be perceived as inhering in the other parts of the statute. One cannot be convicted, as defendant argues, for merely being in proximity to the victim on two occasions. On the contrary, one cannot run afoul of the law unless the conduct is purposely directed at the victim and is such that it would cause a reasonable person to fear physical harm. In addition, there can be no guilt unless the defendant knowingly, recklessly, or, at least, negligently places the victim in reasonable fear of physical harm. A statute is facially vague if "there is no conduct that it proscribes with sufficient certainty." State v. Cameron, 100 N.J. 586, 593, 498 A.2d 1217 (1985). Given the mental-state requirements of the present statute and its other definitional components, the nature of the conduct prohibited is clear.
Defendant also contends the statute is vague as applied to him in the circumstances of this case. We disagree.
A statute may be unconstitutionally vague as applied if it "does not with sufficient clarity prohibit the conduct against which it [is] sought to be enforced." Ibid. Employing that standard, we will briefly comment on defendant's behavior.
Defendant opened his relationship to the victim, a stranger, by asking for sex in return for money or drugs. In other words, his first act was to suggest that she violate the law against prostitution. N.J.S.A. 2C:34-1b(1). In addition, by this request he committed the offense of promoting prostitution. N.J.S.A. 2C:34-1b(2). He further demonstrated his willingness to violate the criminal laws when he offered her cocaine. When she refused, his pursuit began.
The next evening she twice indicated to him that she wanted to be left alone, first when he called her at work, and second when she left work. During the telephone conversation, he made two statements that were threatening in context. He said to the victim's co-worker as the victim listened on an extension, "If she doesn't understand who I am or she doesn't get on the phone right now, I will make sure I catch up with her later." And he said directly to the victim, "You know who I am. I'm the one that you need to take up my offer." That night he waited until she left work and followed her in his truck for a short distance.
The next night he followed her for over three miles, only going away when she pulled into the driveway of a stranger's house that was only a block from her home. A day or two later, defendant was seen parked behind dumpsters at the victim's place of work shortly before she usually left work. When she drove home that night and got near to her house, the defendant was standing beside his truck waiting and spoke to her about the dent in her car.
The next evening, defendant repeatedly drove around the Playdrome parking lot and then parked across the street waiting for her. When she started her car, he started his truck and then drove slowly past her where she stood in the parking lot with two friends. Police responding to her telephone call for help could not locate him. Nonetheless, when she left for home at about 2 a.m., the defendant again appeared in his truck and followed her for about five blocks to her home.
This conduct is unquestionably proscribed by the statute. The defendant maintained the prohibited proximity on far more than *118 two occasions. His conduct, occurring late at night, was threatening, purposeful, and directed at the victim. He persisted in asking for sexual conduct that he knew was unwanted and implied that she had better agree. We are satisfied that the entire course of conduct would cause a reasonable person to fear bodily injury or death and that a defendant acting in that manner would or should know that he was placing the victim in such fear. To suggest, as the defendant does, that his activity could be seen as the pursuit of "normal social interaction" is absurd. On the contrary, his conduct was a patent violation of the statute. Therefore, we reject his claim that the statute is unconstitutionally vague as applied to him.

III.
Defendant also contends that the trial judge erred in denying his motion for a judgment of acquittal. Although not raised below, he adds a claim for a new trial on the ground that the verdict was against the weight of the evidence. Under both points, he argues there was insufficient evidence for a reasonable person in these circumstances to fear bodily injury. Our discussion under Point II demonstrates that argument's lack of substance.
In light of the principles governing motions for judgment of acquittal, see, e.g., State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967), and those governing motions for a new trial, see, e.g., State v. Brown, 118 N.J. 595, 604, 573 A.2d 886 (1990), the claims for those forms of relief are without merit and do not warrant further discussion. R. 2:11-3(e)(2).

IV.
Defendant requested and received a charge on the lesser included offense of harassment as set forth in N.J.S.A. 2C:33-4c. That subsection states that one is guilty of a petty disorderly persons offense if "with purpose to harass another" one "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." He does not criticize the charge as given.
Instead, he now complains for the first time that the trial judge should also have charged that portion of subsection "a", which created the petty disorderly offense of making communications in "offensively coarse language" with the purpose to harass. N.J.S.A. 2C:33-4a. Without identifying the words that he claims were offensively coarse, defendant contends as a matter of plain error that subsection "a" was implicated. In light of the evidence, the only words to which he could be referring, as described by the victim, were to have "sex" with him or to "give him head." Although those statements might be considered rude and perhaps offensively coarse, there is no evidence that either statement was made with a purpose to harass. Quite the opposite. The only reasonable interpretation in these circumstances is that defendant wanted to persuade the victim to voluntarily engage in sexual activity.
A defendant's entitlement to a charge on a lesser included offense depends on the presence of a rational basis for conviction of that charge. State v. Harris, 141 N.J. 525, 571, 662 A.2d 333 (1995). Subsection "a" requires proof of a purpose to harass. There was no such proof. Given the insufficiency of the evidence to support conviction under subsection "a", the trial court did not err in omitting that offense in its charge to the jury.

V.
Defendant concludes his argument by complaining about the length of his sentence. In light of his record of nine prior offenses, we cannot say that the eighteen-month sentence, including nine months to be served without parole, "shocks the judicial conscience." State v. Roth, 95 N.J. 334, 364-65, 471 A.2d 370 (1984). The trial judge followed the applicable sentencing guidelines, finding and applying aggravating factors supported by the record and giving extensive reasons for his sentence. In such circumstances, an appellate court may not alter the sentence. See, e.g., State v. Johnson, 309 N.J.Super. 237, 270, 706 A.2d 1160, certif. denied, 156 N.J. 387, 718 A.2d 1216 (1998).
Affirmed.
NOTES
[1] In pertinent part, the original version of the act is this:

a. As used in this act:
(1). "Course of conduct" means a knowing and willful course of conduct directed at a specific person, composed of a series of acts over a period of time, however short, evidencing a continuity of purpose which alarms or annoys that person and which serves no legitimate purpose. The course of conduct must be such as to cause a reasonable person to suffer emotional distress. Constitutionally protected activity is not included within the meaning of "course of conduct."
(2) "Credible threat" means an explicit or implicit threat made with the intent and the apparent ability to carry out the threat, so as to cause the person who is the target of the threat to reasonably fear for that person's safety.
b. A person is guilty of stalking, a crime of the fourth degree, if he purposely and repeatedly follows another person and engages in a course of conduct or makes a credible threat with the intent of annoying or placing that person in reasonable fear of death or bodily injury.
c. A person is guilty of a crime of the third degree if he commits the crime of stalking in violation of an existing court order prohibiting the behavior.
d. A person who commits a second or subsequent offense of stalking which involves an act of violence or a credible threat of violence against the same victim is guilty of a crime of the third degree.
e. This act shall not apply to conduct which occurs during organized group picketing.
[2] As amended, the act, N.J.S.A. 2C:12-10, now provides the following:

a. As used in this act:
(1) "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person or repeatedly conveying verbal or written threats or threats implied by conduct or a combination thereof directed at or toward a person.
(2) "Repeatedly" means on two or more occasions.
(3) "Immediate family" means a spouse, parent, child, sibling or any other person who regularly resides in the household or who within the prior six months regularly resided in the household.
b. A person is guilty of stalking, a crime of the fourth degree, if he:
(1) Purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or a member of his immediate family or to fear the death of himself or a member of his immediate family; and
(2) Knowingly, recklessly or negligently places the specific person in reasonable fear of bodily injury to himself or a member of his immediate family or in reasonable fear of the death of himself or a member of his immediate family.
c. A person is guilty of a crime of the third degree if he commits the crime of stalking in violation of an existing court order prohibiting the behavior.
d. A person who commits a second or subsequent offense of stalking against the same victim is guilty of a crime of the third degree.
e. A person is guilty of a crime of the third degree if he commits the crime of stalking while serving a term of imprisonment or while on parole or probation as the result of a conviction for any indictable offense under the laws of this State, any other state or the United States.
f. This act shall not apply to conduct which occurs during organized group picketing.
A second amendment, L. 1998, c. 17, reflected above, redesignated former subsection "e" dealing with group picketing as subsection "f" and adopted a new subsection "e". Neither form of subsection "e" is implicated in this case.
[3] We note that these terms are defined in N.J.S.A. 2C:2-2b.
[4] The Model Code reads as follows:

Any person who:
(a) purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person to fear bodily injury to himself or herself or a member of his or her immediate family or to fear the death of himself or herself or a member of his or her immediate family; and
(b) has knowledge or should have knowledge that the specific person will be placed in reasonable fear of bodily injury to himself or herself or a member of his or her immediate family or will be placed in reasonable fear of the death of himself or herself or a member of his or her immediate family; and
(c) whose acts induce fear in the specific person of bodily injury to himself or herself or a member of his or her immediate family or induce fear in the specific person of the death of himself or herself or a member of his or her immediate family; is guilty of stalking.
[National Institute of Justice, Project to Develop A Model Anti-stalking Code for States 43-44 (1993).]