**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4214-15T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

B.A.,

      Defendant-Appellant.

_____

<table>
<tr><td>**APPROVED FOR PUBLICATION**</td></tr>
<tr><td>**March 22, 2019**</td></tr>
<tr><td>**APPELLATE DIVISION**</td></tr>
</table>

Argued November 27, 2018 – Decided March 22, 2019

Before Judges Fisher, Suter and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. 13-08-2454.

Frank M. Gennaro, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Frank M. Gennaro, on the brief).

Jason Magid, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Jason Magid, of counsel and on the brief).

The opinion of the court was delivered by

SUTER, J.A.D.

Defendant B.A. appeals his judgment of conviction for third-degree stalking, N.J.S.A. 2C:12-10(c).  He argues the statute is unconstitutionally overbroad and vague, that he was denied a fair trial based on certain evidence rulings and that this offense should not have been graded as a third-degree crime under N.J.S.A. 2C:12-10(c).  We find the statute is constitutional, there were no trial errors that were "clearly capable of producing an unjust result," Rule 2:10-2, and there was substantial evidence to support grading this conviction as a third-degree offense under the statute.

I

The evidence adduced at trial revealed that J.R.[1] and defendant met via an internet dating site in October 2010 and began dating a month later.  J.R. ran an internet marketing agency called XYZ, which she founded.  Defendant, a schoolteacher, was then unemployed.  He began to assist her with work as an independent contractor.  Their romantic relationship ended following a heated argument in early February 2011.  She testified she broke up with defendant because he had become more demanding of her time, would call her repeatedly if she did not answer her phone, and because her daughter was "very

---

[1]  We have used abbreviations for J.R. and for defendant, B.A., and a pseudonym for J.R.'s company, XYZ, to maintain privacy.

uncomfortable" with his presence.

J.R. testified that defendant sobbed and begged her to reconcile with him, and then in the same conversation yelled at her and threatened to "ruin" her life, her business career, and her reputation. He said he would hurt her "in any way possible." Although their professional relationship continued for about a month after the breakup, because of pending work, it too ended badly with J.R. sending defendant cease-and-desist letters to discontinue his contacts with her clients, and accusing him of undermining those relationships. Defendant then sued J.R. for uncompensated work.

J.R. testified that defendant began to join groups she belonged to and attend events when she would be present. She had a scheduled speaking engagement in March 2011 before the Camden County Chamber of Commerce, and defendant joined that group. She testified she was "very alarmed." In April 2011, defendant joined the South Jersey Business Networking Group. In November 2011, J.R. posted on the Camden County Chamber's LinkedIn webpage promoting an event she was organizing. Defendant commented on J.R.'s post, stating that he intended to attend. In January 2012, defendant attended a joint networking event for the Philadelphia and Camden Chambers of Commerce; J.R. was a member of the board. In April 2012, J.R. saw defendant

A-4214-15T4

at an event for a group she had founded called the "Ladies Networking Group." Then, in June 2012, a friend warned J.R. not to attend a rotary luncheon because defendant was there. J.R. testified she was "upset and shaking" when she learned he was there.

J.R. learned in April 2011 that defendant had begun following her on Twitter. J.R. immediately "blocked" defendant, thereby preventing him from following or contacting her on that platform.

In November 2012, J.R. learned about a website titled "Band Aid Justice," where videos were posted that appeared to disparage her. These also were on streaming video websites, YouTube and Vimeo, under an account with the same name. The court admitted into evidence two videos from this series. These videos were titled for purposes of the trial: "Cross-Motion Claiming Physical Violence" ("Physical Violence"), and "Who Asked for Your Opinion."

J.R. testified that defendant "tagged" her in the "Physical Violence" video, though he did not refer to her by name in that video. She said a "tag" is a feature by which YouTube allows a user, who is posting a video, to place a "tag" on the video, which could include a person's name. The purpose of a tag "is to be able to have [the video] discovered when a person searches for that term." Then, if a user has set up a "Google alert" for a name or term, Google will notify the user

every time that name or term is tagged in a video or mentioned online. J.R. explained to defendant while they were dating that she received Google alerts when her name or business was mentioned online. Thus, she alleged that defendant knew that she would receive a Google alert each time he tagged her on one of his videos.

On the "Physical Violence" video, defendant criticized the justice system and explained that he was the subject of false accusations that could trigger an "emotional response." This video featured a clip from the film Inglourious Basterds, which J.R. testified scared her, because it depicted a man grabbing a blonde woman by the throat and strangling her to the ground.

The "Who Asked for Your Opinion" video featured a recording of the song, "One Way or Another" by Blondie with the lyrics: "[o]ne way or another, I'm gonna find ya', I'm gonna get ya', get ya', get ya', get ya'." J.R. testified that the videos "terrified" her.

Defendant posted other videos to a website called MonkeyCom modeled after her business's website, but on MonkeyCom her face was photoshopped over the caricature of a monkey. Defendant posted these videos to YouTube under an account with the same name. During the period of the indictment, January 2, 2013 to May 15, 2013, defendant posted 176 videos to the

MonkeyCom site and YouTube account. Ten of the MonkeyCom videos were shown to the jury.

J.R. discovered MonkeyCom after she received a Google alert. In five of the ten "MonkeyCom" videos, defendant refers to himself by name, either verbally or in screen text, as a "stalker," "harasser," and an "internet troll." Four feature the J.R. photoshopped caricature alongside text identifying her by name as a "criminal at large." Three claim or imply that J.R. is suffering from a mental illness. J.R. testified that she was scared upon watching the video series because she feared he was trying to "drive [her] business to the ground."

J.R. testified that another video titled for purposes of trial, "RU Burger Farms Breakfast Patties" ("RU Burger Farms"), made her scared for her safety. That video shows J.R.'s dog "Ruger," a Belgian Malinois. J.R. testified she obtained Ruger for protection from defendant. This video shows what purports to be a box of sausage patties made from "Belgian Malinois meat products," with a picture of a dog resembling Ruger photoshopped onto the box. Defendant then is shown sitting at a table dining on the sausage patties and commenting on how delicious they are, noting, among other descriptions, their "gooey taste" and "nice bloody center."

In another video, "Coming Soon MonkeyCom [XYZ] [J.R.]," after Ruger's

image fades, it is replaced with meat processing footage. Following that are video clips of monkeys in business suits in an office that defendant calls the XYZ "corporate office."

In "MonkeyCom News [J.R.] of [XYZ] Reports Her Dog as Being Eaten" ("MonkeyCom News"), defendant identified J.R. by name and then narrated a story that was filled with sexually explicit double entendres involving a rooster and cat. J.R. testified that she felt disgusted by this video and found it to be pornographic and sick.

In the spring of 2013, when the MonkeyCom account was active, J.R. received more than 100 Google alerts notifying her that she had been mentioned or "tagged" in one of defendant's videos. J.R. testified she eventually disbanded XYZ because of the "MonkeyCom" series and had to seek professional help to deal with the emotional impact of the videos. J.R. stopped public speaking and attending networking events from fear she would encounter defendant or say something he would parody in a video.

A detective for the Division of Criminal Justice testified that defendant's internet browser included websites called getrevenge.com, getrevengeonyourex.com, and bestrevengewebsites.html that defendant had bookmarked.

J.R. obtained a temporary restraining order (TRO) against defendant in March 2011, but then agreed to the entry of civil restraints. On August 2, 2012, both parties consented to entry of an Indefinite Temporary Restraining Order (ITRO). This prohibited defendant from contacting J.R. through any means, including electronic.

Defendant testified that he, not J.R., ended the dating relationship; he wanted to spend more time with her but she was busy with work and family pressures. She also wanted to run for a local political office and it "scared" him because that was "another thing that came into the relationship." He testified that at one point, she did not return his calls but had time to post to Facebook, which made defendant "very, very angry," and he ended the relationship as a result following a "heated discussion."

He acknowledged receiving a cease-and-desist letter from an attorney. He filed a civil suit against J.R. Then his unemployment was terminated.

Defendant testified it was just a coincidence that in 2011 and 2012, he and J.R. attended the same events. He joined the same groups to which she had belonged, because he was unemployed and needed to network because building websites and design work was his only marketable skill. At some point, however, he was asked not to attend an event and was threatened.

Defendant testified that he tagged videos not to send them to J.R. but to make his viewers aware that J.R. was the subject of his videos. The MonkeyCom series of videos were parodies where he commented on and mocked things J.R. had said about him; he explained they were not "about" her.

Defendant believed that J.R. was stalking and harassing him. He used the Blondie song in a Band Aid Justice Video because he identified with Blondie, who he said was being stalked at the time she released the song.

Defendant testified the "RU Burger Farms" videos were a response to J.R.'s video of Ruger—that she posted to YouTube—commanding her dog to "get him," and "eat him." Defendant assumed this was about him even though he was not mentioned by name. His videos were intended to be jokes, not threats.

On cross-examination, defendant acknowledged entries from his diary that were written between October and November 2011, saying he was "sad and angry" from the breakup, was "chasing [J.R.]" in his "mind," and was "constantly trying to find a way to get revenge." In January 2012, he wrote, "I need [J.R.] so I feel more valuable than I see myself to be. I have no one to impress. I want to have the one I love be impressed by who I am." In the same entry, defendant wrote, "Dear [J.R.] . . . I didn't think you had me in your plans,

but I'm making sure that you remember me. I'm making sure you know I'm alive and real and that I have feelings. What you've done by moving me aside I'll never forget." In an entry from April 2012, defendant wrote that his actions in signing up for chamber events were not the "best decision, but [he] was angry." Defendant said these entries had nothing to do with J.R. but were examples of cathartic writing.

* * *

In August 2013, defendant was indicted on one count of third-degree stalking, N.J.S.A. 2C:12-10(c), for conduct during the period from January 2, 2013 to May 15, 2013, in violation of the ITRO. The court bifurcated the trial with defendant's consent. The jury would first hear evidence about the stalking offense without any reference to the ITRO, and then, if the jury convicted defendant of stalking, the same jury would hear evidence about the ITRO to determine whether the stalking offense warranted grading it as a third-degree crime. Defendant was self-represented during the trial with stand-by counsel.

Defendant was convicted of stalking following a multiple-day jury trial. The same jury then heard the second issue, determining that defendant's stalking violated the ITRO. That finding raised the stalking offense to a third-degree crime. See N.J.S.A. 2C:12-10(c). Defendant was sentenced to a four-year term

10

of probation conditioned on 364 days of incarceration. A permanent restraining order for the stalking conviction was issued under N.J.S.A. 2C:12-10.1.

On appeal, defendant contends the anti-stalking statute is unconstitutional because N.J.S.A. 2C:12-10(a)(1) imposes an improper restriction on the First Amendment guarantee of free speech. He argues the trial court's decision to admit evidence of conduct that occurred pre-indictment as both intrinsic evidence and under N.J.R.E. 404(b), in combination with a deficient limiting instruction, constituted plain error. He further contends he was denied a fair trial when the trial court excluded a video that he wanted the jury to see as part of his defense, and by allowing improper lay opinion testimony. Even if the conviction for stalking were proven, which defendant denies, he argues his conviction for third-degree stalking must be vacated.

II

A

We start with defendant's constitutional challenge to the anti-stalking statute. The trial court denied defendant's pre-trial motion to dismiss the indictment based on his claim the anti-stalking statute violated his First Amendment right to free speech and was unconstitutionally vague. During the trial, when defendant reasserted the constitutional arguments, the trial court

ruled that the anti-stalking statute was not a content-based restriction on free speech. On appeal, defendant contends the statute criminalizes speech made in a public forum to willing listeners in violation of the State and Federal Constitutions. Even if the videos were "distasteful," he argues they are protected speech. He contends the anti-stalking statute penalizes him for the content of his speech in the videos.

In 2009, the anti-stalking statute was amended to provide as follows:

> a. As used in this act:
>
> (1) "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, <u>or communicating to or about, a person</u>, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.
>
> (2) "Repeatedly" means on two or more occasions.
>
> (3) "Emotional distress" means significant mental suffering or distress.
>
> (4) "Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.

b. A person is guilty of stalking, a crime of the fourth degree, if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress.

c. A person is guilty of a crime of the third degree if he commits the crime of stalking in violation of an existing court order prohibiting the behavior.

[N.J.S.A. 2C:12-10(a) to (c) (emphasis added).]

Defendant's focus in this appeal is on the phrase, "communicating to or about, a person" that he says is unconstitutionally overbroad and vague.

"[T]he Legislature intended the anti-stalking statute to cast a wide net of protection for stalking victims by broadly prohibiting and punishing persistent, unwanted, and frightening behaviors." State v. Gandhi, 201 N.J. 161, 187 (2010). It has been upheld against previous challenges to its constitutionality. See State v. Saunders, 302 N.J. Super. 509 (App. Div. 1997) (upholding the original 1992 version, L. 1992, c. 209, § 1, against a First Amendment overbreadth and vagueness challenge); State v. Cardell, 318 N.J. Super. 175 (App. Div. 1999) (upholding the 1996 amended statute, L. 1996, c. 39, §1, against similar challenges). The statute was amended in 1999 (L. 1999, c. 47, §1) to delete "the specific intent requirement applicable to the effect of a stalker's conduct," and again in 2001 (L. 2001, c. 220, § 2), when it was

"expanded to include situations in which a stalker indirectly conveys threats through any means of communication." Gandhi, 201 N.J. at 182-83, 185. Each of these amendments showed "the legislative design" to broaden the statute "toward greater restrictions on stalking behavior and, correspondingly, greater protections for victims of that behavior . . . ." Id. at 185.

In 2009, the statute was "broadened 'to cover stalking by means of new technology, such as situations where the stalker tracks the victim through the use of a global positioning system attached to the victim's car.'" Id. at 185 n.12 (quoting Assemb. Law & Public Safety Comm. Statement to Assemb., No. 1563, 213th Leg. 1-2 (N.J. 2008)). These amendments were based on a 2007 report by the National Center for the Victims of Crime (NCVC). Sponsor's Statement to A. 1563 3-4 (L. 2009, c. 28). With respect to "new technology," the NCVC report noted that "[n]ew, affordable technology has fundamentally and profoundly changed the way stalkers monitor and initiate contact with their victims." Nat'l Ctr. for Victims of Crime, The Model Stalking Code Revisited: Responding to the New Realities of Stalking 15 (2007). The NCVC added that "victims . . . often cannot perform everyday tasks such as . . . using their computers without fear of unwanted contact from the person who is stalking

A-4214-15T4

them." Id. at 15. The legislature "substantially broadened victim protection." Cannel, N.J. Criminal Code Annotated, cmt. 1 on N.J.S.A. 2C:12-10(1) (2018).

Relevant here, the 2009 amendment modified the "course of conduct" definition to add the language "communicating to or about, a person" and included "indirect conduct, conduct through third parties, and repeated harassment." Ibid. The amendment "imposed liability for causing emotional distress and added definitions for 'emotional distress' and 'cause a reasonable person to fear.'" Ibid.

"A presumption of validity attaches to every statute"; the burden is on the party challenging the constitutionality of the statute to establish its unconstitutionality. State v. Lenihan, 219 N.J. 251, 266 (2014). We "are obligated to construe a challenged statute to avoid constitutional defects if the statute is reasonably susceptible of such construction." Id. at 266 (quoting Cty. of Warren v. State, 409 N.J. Super. 495, 506 (App. Div. 2009)). Where a statute "criminalizes expressive activity," we construe it "narrowly to avoid any conflict with the constitutional right to free speech." State v. Burkert, 231 N.J. 257, 277 (2017).

Defendant challenges the anti-stalking statute as unconstitutionally overbroad and vague both facially and as applied. When considering

overbreadth, the "first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail." Saunders, 302 N.J. Super. at 517 (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95 (1982)).

Defendant argues the statute is overbroad because its definition of "course of conduct" in N.J.S.A. 2C:12-10(a)(1) uses the phrase "communicating to or about, a person." Defendant's analysis stops there, however, without any reference to, or consideration of, the rest of the statute. We said—regarding a similar challenge to the 1996 version of the statute—that "course of conduct" and the phrases used within its definition "cannot be considered in isolation from the balance of the statute, which clearly limits its reach . . . ." Cardell, 318 N.J. Super. at 183. Those limitations existed then and now in the statute: the speech or conduct has to be "directed at a specific person"; the conduct has to be engaged in "purposefully or knowingly" by the defendant; the statute limits the nature of the prohibited activity to a course of conduct that "would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress"; the "emotional distress" must be "significant"; and the "fear" is objectively based, meaning the fear "which a reasonable victim,

similarly situated, would have under the circumstances." N.J.S.A. 2C:12-10(a)(4); N.J.S.A. 2C:12-10(b). Although the 2009 amendment to the definition of course of conduct added additional protection for victims, it did not do so in a way that extended it to a "substantial amount of constitutionally protected conduct," Cardell, 318 N.J. Super. at 184 (quoting State v. Mortimer, 135 N.J. 517, 530 (1994)), because of the other limitations in the statute. Defendant's analysis fails to take these restrictions into consideration. Thus, we reject defendant's facial overbreadth challenge; it is neither "real" nor "substantial" when "judged in relation to the statute's plainly legitimate sweep." Broadrick v. Okla., 413 U.S. 601, 615 (1973).

"[T]he Legislature framed the New Jersey Code of Criminal Justice with a conscious deference to the right of free expression." Burkert, 231 N.J. at 275. There are certain limited categories of speech, however, that are criminalized. These include: "speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct." Id. at 281 (citing United States v. Alvarez, 567 U.S. 709, 717 (2012)). With respect to speech "integral to criminal conduct," the "immunity" of the First Amendment will not extend to "a single and integrated course of conduct" that violates a valid criminal statute. Giboney v.

Empire Storage & Ice Co., 336 U.S. 490, 498 (1949). "The First Amendment also does not bar states from enacting laws that punish expressive activity when 'substantial privacy interests are being invaded in an essentially intolerable manner.'" Burkert, 231 N.J. at 282 (quoting Cohen v. Cal., 403 U.S. 15, 21 (1971)). "Freedom of speech does not encompass a right to abuse or annoy another person intentionally." Saunders, 302 N.J. Super. at 519.

Defendant's videos were not protected speech under the First Amendment or the New Jersey Constitution. See United States v. Sayer, 748 F.3d 425, 429, 433-34 (1st Cir. 2014) (where defendant posted unauthorized advertisements, created false Facebook accounts using Jane Doe's name, and posted sexually explicit pictures and videos of her, the court found that this was considered speech integral to the criminal conduct of harassment); see also United States v. Petrovic, 701 F.3d 849, 855 (8th Cir. 2012) (where defendant distributed Jane Doe's confidential information, posted screen shots of private conversations, and put her contact information and her children's social security numbers online, defendant's communications were considered "integral to his criminal conduct of extortion" as they were the means of carrying out his threats).

Defendant posted multiple videos in the MonkeyCom series to YouTube. The "RU Burger Farms" and "Coming Soon" videos could reasonably be

interpreted as expressing defendant's intent to kill and consume J.R.'s dog, whom she had specifically purchased to protect her from defendant. Defendant's lewd comments about J.R.'s alleged sexual acts in another video were not "common knowledge" irrespective of their truth or falsity. The tagging of J.R. on the MonkeyCom videos that defendant knew she would see via a Google alert initiated "electronic . . . contact with J.R." in violation of the ITRO. J.R. was identified by name as a "criminal at large." Other videos suggested J.R. suffered from mental illness. Because we agree that defendant's conduct was integral to contempt of the restraining order, and harassing, it was not protected under the First Amendment or the New Jersey Constitution. Therefore, as applied to defendant, the statute was not unconstitutionally overbroad.

Defendant claims the anti-stalking statute is unconstitutionally vague both on its face and as applied to him. When an overbreadth challenge is rejected, "[t]he court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications." Saunders, 302 N.J. Super. at 517 (quoting Hoffman Estates, 455 U.S. at 494-95). However, a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct

of others." Ibid. (quoting Hoffman Estates, 455 U.S. at 494-95). Thus, it is defendant's conduct that must be analyzed not "hypothetical applications of the law." Ibid. (quoting Hoffman Estates, 455 U.S. at 494-95). Because we conclude the statute is not unconstitutionally vague as applied to defendant, we have no need to address whether the statute is unconstitutionally vague on its face.

"Vague and overly broad laws criminalizing speech have the potential to chill permissible speech, causing speakers to silence themselves rather than utter words that may be subject to penal sanctions." Burkert, 231 N.J. at 276 (citing Reno v. ACLU, 521 U.S. 844, 871-72 (1997) and NAACP v. Button, 371 U.S. 415, 433 (1963)). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." Hoffman Estates, 455 U.S. at 498. An offense must be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). "A statute may be unconstitutionally vague as applied if it 'does not with sufficient clarity prohibit the conduct against which it [is] sought to be enforced.'" Cardell, 318 N.J. Super. at 188 (alteration in original) (quoting State

v. Cameron, 100 N.J. 586, 593 (1985)). "To be vague 'as applied,' the law must not clearly prohibit the conduct on which the particular charges were based." Saunders, 302 N.J. Super. at 521 (quoting Cameron, 100 N.J. at 593).

Using these standards, defendant's conduct unquestionably triggered application of the statutory provisions. His conduct was directed at J.R. because she would be alerted to what he was posting though Google alerts. He therefore was communicating to, and about, J.R. This also violated the ITRO. Then, the nature and content of the videos were such as to cause a reasonable person to fear for their safety or cause emotional distress. The MonkeyCom videos suggested killing and mutilating her pet; another was sexually explicit. She was referred to as a criminal and mentally unstable. Defendant referred to himself as a stalker and indicated he was angry based on his perception of events. Music suggested he would "get her." All of this was done with knowledge and purposely directed at J.R. Thus, we reject defendant's argument that the statute is unconstitutionally vague as applied to him; it applied directly to proscribe his conduct. This obviates our need to address any claim of facial unconstitutionality for vagueness.

B

The indictment charged defendant with third-degree stalking for his conduct from January 2, 2013 to May 15, 2013. Defendant contends it was plain error for the court to admit evidence during the trial that related to any time prior to January 2, 2013 (the pre-indictment evidence). He also argues the trial court's "hybrid" jury instruction that addressed the use of pre-indictment evidence was deficient because it did not tell the jury it could not use pre-indictment evidence to prove the course of conduct element under the stalking statute.

The pre-indictment evidence included: defendant's emotional outburst after his relationship with J.R. ended and his threat to "ruin" her; defendant's civil lawsuit against J.R.; his attempt to follow her on Twitter; his attendance at networking events that J.R. attended; his joining of clubs with which he knew she was affiliated; and two Band Aid Justice videos from prior to January 2, 2013.

This evidence was admitted without objection by defendant. In fact, defendant invited the introduction of this evidence to explain his conduct and also opposed the State's effort, in the initial portion of the trial, to exclude evidence of the prior restraining order and his litigation.

The trial court ruled that the pre-indictment evidence was admissible both as intrinsic evidence that directly proved the crime and under N.J.R.E. 404(b) as evidence of motive or intent. We review this issue under a plain error standard, meaning we will only reverse if the error is "clearly capable of producing an unjust result." State v. Rose, 206 N.J. 141, 157 (2011) (quoting R. 2:10-2).

Intrinsic evidence is evidence that "directly proves" the charged offense or evidence of "acts performed contemporaneously with the charged crime . . . [that] facilitate the commission of the charged crime." Rose, 206 N.J. at 180 (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)). It is distinguishable from "other crimes" evidence under Rule 404(b) because it is not evidence of another crime; it directly proves the charged offense. Id. at 177. "[E]vidence that is intrinsic to a charged crime need only satisfy the evidence rules relating to relevancy, most importantly the [N.J.R.E.] 403 balancing test." Id. at 177-78. In contrast, under Rule 404(b), evidence of other crimes is not admissible but it can be used for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b); see Rose, 206 N.J. at 177.

The trial court admitted the pre-indictment evidence both as intrinsic evidence and under Rule 404(b). The trial court conducted a Cofield[2] analysis as required under Rule 404(b), finding the pre-indictment evidence was admissible.

The evidence was intrinsic evidence. It showed the relationship that ended and the conduct that ensued after; it offered direct proof of defendant's motive for producing the videos, and showed his obsession with, and hostility toward, J.R. We find no error by the trial judge in admitting this as relevant evidence that was probative and not unduly prejudicial. Although it may have been error to treat this evidence as both intrinsic and under Rule 404(b), we do not find that error rose to the level of plain error. The confusion was that the evidence tended to prove motive or intent, which also was admissible under Rule 404(b).

The court gave a "hybrid" jury instruction because of its treatment of this pre-indictment evidence as both intrinsic and admissible under Rule 404(b). We do not find the instruction constituted plain error on this record because it instructed the jury that the evidence could not be used as proof defendant had a tendency to commit crime or was a bad person.

---

[2] State v. Cofield, 127 N.J. 328, 338 (1992).

Defendant claims he was deprived of a fair trial because one of the videos (Video 14)[3] was excluded that he wanted to be shown to the jury. He claimed the State had chosen this May 2013 video as evidence of stalking and then decided not to show it to the jury. Defendant wanted the jury to see it, because he argued it showed his purpose in making the video was to expose his maltreatment by the justice system. Defendant acknowledged he wanted to introduce the video as proof of a prior consistency, namely that the explanation for his actions had not changed from the time before he was charged right up to, and through, the time of trial.

We review the court's evidence ruling under an abuse of discretion standard. Rose, 206 N.J. at 157. The judge did not err in excluding this prior consistent statement under N.J.R.E. 803(a)(2). That Rule provides that a statement is not excluded as hearsay if it was,

> previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
>
> . . . .

---

[3] The reference is to a document titled Synopsis of Videos for Trial [B.A.]. Video 14 is on that list.

(2) is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive[.]

[N.J.R.E. 803(a)(2).]

The State did not allege any "express or implied charge against [defendant] of recent fabrication or improper influence or motive." As the court observed, defendant was able to, and did, testify to the jury about his actions and their motivation. Thus, the court did not abuse its discretion in excluding this video because it was a prior consistent statement offered without any claim by the State of recent fabrication.

D

Defendant argues the trial court committed plain error because J.R. should not have been permitted to offer her lay opinion that defendant's conduct constituted "harassment" or "stalking." We review this evidence issue for plain error because defendant did not object at trial.

Evidence Rule 701 permits a lay witness to testify in the form of opinions or inferences "if it . . . is rationally based on the perception of the witness," and if it "will assist in understanding the witness' testimony or in determining a fact in issue." State v. McLean, 205 N.J. 438, 456 (2011) (quoting N.J.R.E. 701).

J.R. testified that when defendant and she first met they had no one in common on LinkedIn but later defendant had over three-hundred mutual connections. She stated her "concern was that he was stalking [her] through [her] LinkedIn and attempting to connect with people that [she] was connected to." J.R. testified the videos concerned her because "[i]t's like everything that I'm doing is subject to ridicule and question and ongoing harassment, and . . . to me it's stalking." She testified her business was suffering and she "was personally afraid." She sought professional help "to talk to somebody . . . . It was an ongoing barrage of harassment, intimidation and stalking." Another witness, A.C., also testified that J.R. stopped attending events because she indicated that in some fashion she was being "stalked" or "harassed" by defendant.

We do not agree that admission of this testimony constituted plain error. A.C.'s testimony described the effect the defendant's conduct had on J.R. and was not admitted for the truth of whether defendant stalked or harassed J.R. Thus, this was not offered as opinion testimony.

When J.R. testified, she did use terms such as harassment and stalking; however, that testimony when read in context was not so much an opinion by J.R. but a description of her subjective state of mind placed in layman's terms.

Moreover, the anti-stalking statute required an evaluation of the facts against an objective measure and not against J.R.'s subjective perception. In defendant's videos played to the jury, he also described himself as "a stalker, harasser and a troll." Thus, this record did not warrant reversal because the comments were not clearly capable of producing an unjust result.

E

Defendant contends his conviction for third-degree stalking should be vacated because "the jury was not instructed that it could not consider any of the evidence of conduct prior to the issuance of the [ITRO] in reaching its verdict." We do not agree there was error warranting the requested relief.

Procedurally, once the jury returned a guilty verdict on the stalking charge, the court commenced part two of the bifurcated trial, notifying the jury it had to address whether defendant committed stalking in violation of the August 2, 2012 court order. The ITRO was marked as evidence.

In charging the jury, the trial court advised that it could "consider the evidence that you've already heard in the initial case." It also read the verdict sheet to the jury prior to its deliberations, which framed the issue for the jury to decide whether defendant did "on diverse dates between the 2nd of January 2013 through the 15th day of May 2013 . . . commit the crime of stalking in violation

of an existing [c]ourt [o]rder prohibiting the behavior." The jury had the verdict sheet during its deliberations.

We have already addressed the use of the pre-indictment intrinsic evidence. The question posed to the jury at this stage was whether defendant committed the crime of stalking from January 2 to May 15, 2013, after the August 2, 2012 order was entered. The court narrowly framed this issue for the jury and it had the verdict sheet during its deliberations for added guidance. We are satisfied that there was no plain error warranting reversal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION