NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2936-22
　　　　　　　　A-2959-22

IN THE MATTER OF THE NEW
JERSEY DEPARTMENT OF
ENVIRONMENTAL
PROTECTION'S APRIL 17, 2023,
55 N.J.R. 661(b) "ENVIRONMENTAL
JUSTICE RULES," ADOPTED
AMENDMENTS N.J.A.C. 7:1C
ET SEQ.

| APPROVED FOR PUBLICATION |
| :---: |
| **January 5, 2026** |
| APPELLATE DIVISION |

IN THE MATTER OF THE
ADOPTION OF N.J.A.C. 7:1C.

Argued October 8, 2025 – Decided January 5, 2026

Before Judges Currier, Berdote Byrne and Jablonski.

On appeal from the New Jersey Department of Environmental Protection.

Robert D. Fox argued the cause for appellant New Jersey Chapter of the Institute of Scrap Recycling Industries, Inc. in A-2936-22 (Manko, Gold, Katcher & Fox, LLP, attorneys; Robert D. Fox and Carol F. McCabe, on the briefs).

Dennis M. Toft argued the cause for appellant Engineers Labor Employer Cooperative of the International Union of Operating Engineers Local 825 in A-2959-22 (Chiesa Shahinian & Giantomasi PC,

attorneys; Dennis M. Toft and Rafael Corbalan, on the briefs).

Kristina L. Miles, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Alexandra L. Horn, Kathrine M. Hunt, Nathaniel I. Levy, Kristina L. Miles, and Sara N. Torres, Deputy Attorneys General, on the briefs).

Casandia Bellevue (Earthjustice) argued the cause for amicus curiae Ironbound Community Corporation, South Ward Environmental Alliance, and New Jersey Environmental Justice Alliance (Jonathan J. Smith (Earthjustice) and Casandia Bellevue, attorneys; Jonathan J. Smith and Casandia Bellevue, on the briefs).

Maggie B. Broughton argued the cause for amicus curiae New Jersey Progressive Equitable Energy Coalition (Eastern Environmental Law Center, attorneys; Maggie B. Broughton and Kaitlin Morrison, on the briefs).

Lawrence Bluestone argued the cause for amicus curiae New Jersey Business & Industry Association (Genova Burns LLC, attorneys; Angelo J. Genova, of counsel; Kenneth J. Sheehan, of counsel and on the briefs).

Brian S. Montag argued the cause for amicus curiae Chemistry Council of New Jersey (K&L Gates LLP, attorneys; Brian S. Montag, Gail H. Conenello, and Malory M. Pascarella, on the briefs).

Johnreichmanlaw LLC, attorneys for amicus curiae Clean Water Action and EmpowerNJ (John H. Reichman, on the briefs).

2

Pashman Stein Walder Hayden, PC, and Jared E. Knicley (Natural Resources Defense Council) of the District of Columbia bar, admitted pro hac vice, and Atid Kimelman (Natural Resources Defense Council) of the California bar, admitted pro hac vice, attorneys for amicus curiae NAACP New Jersey State Conference, NAACP Newark Branch, Salvation and Social Justice, Faith in New Jersey, Make The Road New Jersey, and Natural Resources Defense Council (CJ Griffin, Jared E. Knicley, and Atid Kimelman, of counsel and on the briefs).

The opinion of the court was delivered by

CURRIER, P.J.A.D.

In these appeals, heard back-to-back, appellants New Jersey Chapter of The Institute of Scrap Recycling Industries, Inc. (ISRI) and Engineers Labor Employer Cooperative of the International Union of Operating Engineers Local 825 (ELEC) appeal the adoption by the New Jersey Department of Environmental Protection (DEP) of its rules and regulations at N.J.A.C. 7:1C (EJRules), which implement the Environmental Justice Law (EJLaw), N.J.S.A. 13:1D-157 to -161.

Appellants argue the EJRules: (1) are ultra vires and exceed the statutory authority provided in the EJLaw; (2) ignore the ordinary meanings of basic terms; (3) are unconstitutionally vague and/or overbroad; and (4) are arbitrary and capricious. After a careful consideration of the contentions in light of the applicable principles of law, we affirm.

3                                                                                    A-2936-22

I.

The EJLaw

In the promulgation of the EJLaw, the Legislature found and declared "that all New Jersey residents . . . have a right to live, work, and recreate in a clean and healthy environment," and that "residents in the State's overburdened communities have suffered from increased adverse health effects including . . . children [who] are especially vulnerable to the adverse health effects caused by exposure to pollution . . . ." N.J.S.A. 13:1D-157. In addition, the Legislature found that "the legacy of siting sources of pollution in overburdened communities continues to pose a threat to the health, well-being, and economic success of the State's most vulnerable residents," and that "no community should bear a disproportionate share of the adverse environmental and public health consequences that accompany the State's economic growth . . . ." Ibid.

The EJLaw's stated purpose therefore is to "correct [the] historical injustice" of "New Jersey's low-income communities and communities of color hav[ing] been subject to a disproportionately high number of environmental and public health stressors . . . ." Ibid. To that end, the Legislature declared

> that the State's overburdened communities must have a
> meaningful opportunity to participate in any decision
> to allow in such communities certain types of facilities
> which, by the nature of their activity, have the

potential to increase environmental and public health stressors; and that it is in the public interest for the State, where appropriate, to limit the future placement and expansion of such facilities in overburdened communities.

[Ibid.]

To accomplish its stated purpose, the EJLaw, enacted in September 2020, requires certain polluting facilities seeking approvals under existing environmental laws—whether for a new facility, an expansion of an existing facility, or renewal of an existing facility's major source permit—to prepare and submit, after a process that includes public participation, an independent analysis of the facility's environmental and public health stressors or impacts on the local overburdened community (OBC), the environmental justice impact statement (EJIS), and to propose all feasible measures to avoid direct facility contributions to those stressors. A permit application is not complete until an EJIS has been done and submitted, and public hearings have been held.

The EJIS requires an applicant to identify and analyze: (1) existing environmental and public health stressors; (2) any adverse environmental and public health stressors; (3) the presence or absence of adverse cumulative stressors; (4) potential environmental and public health stressors associated with a facility; (5) whether the facility can avoid causing a disproportionate impact; (6) the measures the facility will propose to implement to avoid or

5

address any disproportionate impact; and (7) where applicable, how the new facility serves a compelling public interest in the overburdened community. If DEP determines the proposal would contribute a disproportionate impact to the OBC, that is, higher than those borne by other communities, it must grant requests for expansions and renewals subject to the addition of specific conditions imposed on the construction and operation of the facility to protect public health. If the application is for a new facility, DEP can either deny the approval or grant it with specific conditions.

An OBC is defined as

> any census block group, as determined in accordance with the most recent United States Census, in which: (1) at least [thirty-five] percent of the households qualify as low-income households; (2) at least [forty] percent of the residents identify as minority or as members of a State recognized tribal community; or (3) at least [forty] percent of the households have limited English proficiency.

> [N.J.S.A. 13:1D-158.]

"Environmental or public health stressors" are defined as

> sources of environmental pollution, including, but not limited to, concentrated areas of air pollution, mobile sources of air pollution, contaminated sites, transfer stations or other solid waste facilities, recycling facilities, scrap yards, and point-sources of water pollution including, but not limited to, water pollution from facilities or combined sewer overflows; or conditions that may cause potential public health impacts, including, but not limited to, asthma, cancer,

A-2936-22

elevated blood lead levels, cardiovascular disease, and developmental problems in the overburdened community.

[Ibid.]

In essence, the EJLaw supplements existing environmental permitting procedures by establishing an overlay requiring certain applicants seeking a permit for a new facility, for expansion of an existing facility, or for renewal of an existing facility's major source permit, to take additional steps if that facility is located, or is proposed to be located, in whole or in part, in an OBC. N.J.S.A. 13:1D-160.

The EJLaw defines "Facility" as

any: (1) major source of air pollution; (2) resource recovery facility or incinerator; (3) sludge processing facility, combustor, or incinerator; (4) sewage treatment plant with a capacity of more than [fifty] million gallons per day; (5) transfer station or other solid waste facility, or recycling facility intending to receive at least 100 tons of recyclable material per day; (6) scrap metal facility; (7) landfill, including, but not limited to, a landfill that accepts ash, construction or demolition debris, or solid waste; or (8) medical waste incinerator; except that "facility" shall not include a facility . . . that accepts regulated medical waste for disposal, including a medical waste incinerator, that is attendant to a hospital or university and intended to process self-generated regulated medical waste.

[N.J.S.A. 13:1D-158.]

And "Major source" is defined as

a major source of air pollution as defined by the federal "Clean Air Act," 42 U.S.C. s.7401 et seq., or in rules and regulations adopted by the [DEP] pursuant to the "Air Pollution Control Act," P.L.1954, c.212 (C.26:2C-1 et seq.) or which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant, or other applicable criteria set forth in the federal "Clean Air Act," . . . .

[Ibid.]

The Legislature directed that DEP "shall adopt . . . rules and regulations to implement the provisions of this [A]ct," N.J.S.A. 13:1D-161(a), and that DEP "may issue a technical guidance for compliance with this [A]ct, which the [DEP] shall publish on its Internet website." N.J.S.A. 13:1D-161(b). The Legislature also ordered that DEP "shall publish and maintain on its Internet website a list of overburdened communities in the State" and "shall update the list of overburdened communities at least once every two years." N.J.S.A. 13:1D-159.

The Legislature further included some additional instructions for the EJIS process. Specifically, it ordered that, "[b]eginning immediately upon the adoption of the rules and regulations . . . ," DEP

shall not consider complete for review any application for a permit for a new facility or for the expansion of an existing facility, or any application for the renewal of an existing facility's major source permit, if the facility is located, or proposed to be located, in whole or in part, in an overburdened community, unless the permit applicant first:

(1) Prepares an environmental justice impact statement [(EJIS)] that assesses the potential environmental and public health stressors associated with the proposed new or expanded facility, or with the existing major source, as applicable, including any adverse environmental or public health stressors that cannot be avoided if the permit is granted, and the environmental or public health stressors already borne by the overburdened community as a result of existing conditions located in or affecting the overburdened community;

(2) Transmits the environmental justice impact statement required to be prepared . . . to the [DEP] and to the governing body and the clerk of the municipality in which the overburdened community is located[, and the DEP] . . . shall publish the environmental justice impact statement on its Internet website; and

(3) Organizes and conducts a public hearing in the overburdened community [after providing public notice] . . . . At the public hearing, the permit applicant shall provide clear, accurate, and complete information about the proposed new or expanded facility, or existing major source, as applicable, and the potential environmental and public health stressors associated with the facility. The permit applicant shall accept written and oral comments from any interested party, and provided [sic] an opportunity for meaningful public participation at the public hearing. . . . Following the public hearing, the [DEP] shall consider the testimony presented and any written comments received, and evaluate the issuance of, or conditions to, the permit, as necessary in order to avoid or reduce the adverse environmental or public health stressors affecting the overburdened community.

The Legislature included five more instructions and procedures for DEP's review process.

First, there must be public participation, that is, "[n]otwithstanding the provisions of . . . any other law, or rule or regulation adopted pursuant thereto, to the contrary," DEP shall "not issue a decision on an application for a permit for a new facility or for the expansion of an existing facility, or on an application for the renewal of an existing facility's major source permit . . . until at least [forty-five] days after the public hearing."  N.J.S.A. 13:1D-160(b).

Second,

> [n]otwithstanding the provisions of any other law, or rule or regulation adopted pursuant thereto, to the contrary, [DEP] <u>shall</u>, after review of the environmental justice impact statement . . . and any other relevant information, including testimony and written comments received at the public hearing, <u>deny a permit for a new facility</u> upon a finding that approval of the permit, as proposed, would, together with other environmental or public health stressors affecting the overburdened community, cause or contribute to adverse cumulative environmental or public health stressors in the overburdened community that are higher than those borne by other communities within the State, county, or <u>other geographic unit of analysis</u> as determined by the [DEP] pursuant to rule, regulation, or guidance adopted or issued . . . , <u>except that where the [DEP] determines that a new facility will serve a compelling public interest in the</u>

community where it is to be located, the [DEP] may grant a permit that imposes conditions on the construction and operation of the facility to protect public health.

[N.J.S.A. 13:1D-160(c) (emphasis added).]

Third,

[n]otwithstanding the provisions of any other law, or rule or regulation adopted pursuant thereto, to the contrary, [DEP] may, after review of the environmental justice impact statement . . . and any other relevant information, including testimony and written comments received at the public hearing, apply conditions to a permit for the expansion of an existing facility, or the renewal of an existing facility's major source permit, concerning the construction and operation of the facility to protect public health, upon a finding that approval of a permit or permit renewal, as proposed, would, together with other environmental or public health stressors affecting the overburdened community, cause or contribute to adverse cumulative environmental or public health stressors in the overburdened community that are higher than those borne by other communities within the State, county, or other geographic unit of analysis as determined by the [DEP] pursuant to rule, regulation, or guidance adopted or issued . . . .

[N.J.S.A. 13:1D-160(d) (emphasis added).]

Fourth,

[i]f a permit applicant is applying for more than one permit for a proposed new or expanded facility, the permit applicant shall only be required to comply with the provisions of this section once, unless [DEP], in its discretion, determines that more than one public hearing is necessary . . . .

11

[N.J.S.A. 13:1D-160(e) (emphasis added).]

And fifth, "[n]othing in this section shall be construed to limit the right of an applicant to continue facility operations during the process of permit renewal . . . ." N.J.S.A. 13:1D-160(f).

DEP's EJRules

On January 16, 2021, per N.J.S.A. 13:1D-159, DEP posted a list of OBCs and created a geographic information system (GIS) online map to provide a visual representation of OBCs throughout the State. N.J.A.C. 7:1C-2.1(d).

Thereafter, before proposing any rules and regulations, DEP conducted ten public engagement sessions seeking input from various stakeholders, including industry groups, environmental and professional organizations, and citizens. 54 N.J.R. 971(a), 972 (June 6, 2022) (proposal). DEP also researched other approaches to environmental justice taken by the federal government and other states. Id. at 974. Both appellants participated extensively in the pre-proposal process as well as in notice-and-comment periods on the proposed rules.

On June 6, 2022, DEP published its proposed EJRules with an extended ninety-day public comment period. Id. at 972. The proposal included an

A-2936-22

appendix identifying and explaining twenty-six items named as qualifying "environmental and public health stressors" under the EJLaw. Id. at 1000-01.

DEP then publicly released an online test version of its Environmental Justice Mapping, Assessment, and Protection Mapping (EJMAP) tool, a GIS tool and a draft Technical Guidance document as required under N.J.S.A. 13:1D-161(b). The EJMAP depicted OBC locations and existing facilities subject to the EJLaw. The Technical Guidance document elaborated on the scientific rationale for each stressor selected and the methodologies for calculating stressor values. Ibid.

On March 9, 2023, after receiving written and oral comments from 497 individuals and entities, and conducting five public hearings, DEP issued an extensive response to the public's comments and then adopted its EJRules with non-substantial changes, which did not require additional public notice and comment. The EJRules were effective April 17, 2023. 55 N.J.R. 661(b) (Apr. 17, 2023) (adoption).

In short, the EJRules provide an overview of their scope, process, and initial screening information in N.J.A.C. 7:1C-2.1 to -2.3, and define key terms left undefined by the Legislature, N.J.A.C. 7:1C-1.5. They advise that applicants seeking approval and who are unsure whether they are subject to the EJRules "may request a [written applicability] determination" from DEP

pursuant to N.J.A.C. 7:1C-2.1(g). The EJRules address each stage of the regulatory process and the particular classes of regulated entities, including the requirements for creating and submitting the EJIS, N.J.A.C. 7:1C-3, the required meaningful public participation process, N.J.A.C. 7:1C-4, applications for new facilities, N.J.A.C. 7:1C-5, applications for expansion of existing facilities, N.J.A.C. 7:1C-6, applications for major source facilities, N.J.A.C. 7:1C-7, applications for renewal of major source facilities, N.J.A.C. 7:1C-8, DEP's decision-making process, N.J.A.C. 7:1C-9, and fees, N.J.A.C. 7:1C-10.

On April 12, 2023, DEP released the final version of its official online EJMAP and Technical Guidance document. The EJMAP has been modified thereafter with the information posted on the DEP website.

## II.

Appellants challenge DEP's adoption of the EJRules, contending: (1) certain definitions are ultra vires, vague, arbitrary and capricious; (2) DEP impermissibly extended the EJRules to "zero population blocks" adjacent to an OBC; (3) DEP adopted permit conditions and impact control measures that exceeded its authority and that are arbitrary, capricious and unreasonable; (4) DEP identified and measured environmental and public health stressors that are contrary to the Legislature's intent and that are arbitrary, capricious and

unreasonable; and (5) DEP violated the Administrative Procedure Act (APA) by issuing the EJMAP and its technical guidance document without conducting formal rulemaking and by failing to include adequate impact analyses with its proposed rules.

Amicus curiae Chemistry Council of New Jersey and New Jersey Business and Industry Association supported appellants' arguments and raised additional arguments. Amicus Clean Water Action (CWA) and EmpowerNJ, Ironbound Community Corporation, South Ward Environmental Alliance, New Jersey Environmental Justice Alliance, NAACP New Jersey State Conference, NAACP Newark Branch, Salvation and Social Justice, Faith in New Jersey, Make The Road New Jersey, Natural Resources Defense Council, and New Jersey Progressive Equitable Energy Coalition submitted briefs and arguments in support of DEP and the EJRules.

III.

Agency regulations are presumed to be "valid and reasonable." N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008). Agencies are afforded flexibility in "select[ing] those procedures most appropriate to enable . . . [them] to implement legislative policy." Texter v. Dep't of Hum. Servs., 88 N.J. 376, 385 (1982). Thus, an agency's action should be afforded "great deference" with respect to its

"interpretation of statutes within its scope of authority and its adoption of rules implementing" them. N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012).

We "extend substantial deference to an agency's interpretation of its own regulations, reasoning that 'the agency that drafted and promulgated the rule should know the meaning of that rule.'" In re Orban/Square Props., LLC, 461 N.J. Super. 57, 72 (App. Div. 2019) (quoting In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341-42 (App. Div. 2005)). In fact, judicial deference is especially appropriate "when the case involves the construction of a new statute by its implementing agency." In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 451-52 (1992) (quoting In re Freshwater Wetlands Prot. Act Rules, N.J.A.C. 7:7A-1.1 et seq., 238 N.J. Super. 516, 527 (App. Div. 1989)). "Delegation of authority to an administrative agency is construed liberally when the agency is concerned with the protection of the health and welfare of the public." In re Health Care Admin. Bd., 83 N.J. 67, 79 (1980) (citing N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-63 (1978)).

However, "the application of 'substantial deference' afforded to regulations is only available if they are 'consistent with the governing statutes' terms and objectives." In re Adoption of N.J.A.C. 17:1-6.4, 17:1-7.5 & 17:1-

7.10, 454 N.J. Super. 386, 395 (App. Div. 2018) (quoting In re Adoption of Amends. to N.J.A.C. 6:28-2.10, 3.6 & 4.3, 305 N.J. Super. 389, 401 (App. Div. 1997)). Stated differently, "a regulation can only be set aside if it is proved to be arbitrary or capricious, plainly transgresses the statute it purports to effectuate, or alters the terms of the statute and frustrates the policy embodied in it." In re Agric., Aquacultural, & Horticultural Water Usage Certification Rules, 410 N.J. Super. 209, 223 (App. Div. 2009) (quoting In re Adopted Amends. to N.J.A.C. 7:7A-2.4, 365 N.J. Super. 255, 265 (App. Div. 2003)).

To determine if the regulation is consistent with the governing statute, we must "determine the intent of the Legislature," Med. Soc'y of N.J. v. N.J. Dep't of L. & Pub. Safety, 120 N.J. 18, 26 (1990), by first looking at the statutory language. DiProspero v. Penn, 183 N.J. 477, 492 (2005). We may also "look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." N.J. Guild of Hearing Aid Dispensers, 75 N.J. at 562.

Regulations are interpreted in the same manner as a statute. In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 542 (2016). Determining the intent of the drafter is paramount, and that is generally found in the regulation's "actual language." US Bank, N.A. v. Hough, 210 N.J. 187,

199 (2012).  The words of a regulation should be given "their ordinary and commonsense meaning," In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 263 (2010) (quoting State v. Gelman, 195 N.J. 475, 482 (2008)), and courts should presume that the drafter "intended the words that it chose and the plain and ordinary meaning ascribed to those words."  Paff v. Galloway Twp., 229 N.J. 340, 353 (2017).

Courts should also view a regulation's words in the context of the entire regulatory scheme of which it is a part, J.H. v. R & M Tagliareni, LLC, 239 N.J. 198, 214 (2019) (citing Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs., 218 N.J. Super. 1, 5 (App. Div. 1985)), and should make every effort "to avoid rendering any part of these provisions inoperative, superfluous or meaningless."  Zimmerman v. Bd. of Rev., 132 N.J. Super. 316, 322 (App. Div. 1975).

Nevertheless, "it is not [the court's] function to 'rewrite a plainly-written enactment,' or to presume that the drafter intended a meaning other than the one 'expressed by way of the plain language.'"  US Bank, 210 N.J. at 199 (quoting DiProspero, 183 N.J. at 492).  We must not "rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning."  Ibid.

A-2936-22

Due process mandates that "regulatory requirements must also be sufficiently specific to apprise those who are regulated of what the agency is requiring." Agric., Aquacultural, & Horticultural Water Usage Certification Rules, 410 N.J. Super. at 224. In other words, regulations cannot be "too vague to establish a standard that is enforceable." Prevention of Cruelty to Animals, 196 N.J. at 412. "A . . . regulation is facially unconstitutional for vagueness if it 'either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.'" Karins v. Atl. City, 152 N.J. 532, 541 (1998) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)). A court "must construe a regulation to render it constitutional if the regulation is reasonably susceptible to such a construction." Id. at 546.

A law is unconstitutionally overbroad if "the reach of the law extends too far in fulfilling the State's interest." State v. Lee, 96 N.J. 156, 165 (1984). Accord State v. Carter, 247 N.J. 488, 518 (2021) (quoting Karins, 152 N.J. at 544). Whereas vagueness "rests on principles of procedural due process" by demanding "that a law be sufficiently clear and precise so that people are given fair notice and adequate warning of the law's reach," overbreadth "rests on principles of substantive due process" and considers, not whether the law's meaning is sufficiently clear, but whether its reach extends too far than is

19

A-2936-22

permitted or necessary to fulfill the State's interests. Carter, 247 N.J. at 518 (quoting Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n.21 (1983)). Thus, "[w]hen considering overbreadth, the 'first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail.'" State v. B.A., 458 N.J. Super. 391, 407 (App. Div. 2019) (quoting State v. Saunders, 302 N.J. Super. 509, 517 (App. Div. 1997)).

Finally, the party challenging validity bears the burden of proving that the regulations are arbitrary, capricious or unreasonable. N.J. State League of Muns. v. N.J. Dep't of Cmty. Affs., 158 N.J. 211, 222 (1999). We review interpretations of statutes and regulations de novo. In re N.J. Dep't of Env't Prot.'s Sept. 6, 2022 Denial of Request for Adjudicatory Hearing, 260 N.J. 256, 269 (2025).

Against this backdrop of applicable legal principles, we turn to appellants' contentions regarding the DEP regulations.

Challenge to Definitions

Appellants contend the following definitions must be stricken as ultra vires, unconstitutionally vague or overbroad, conflicting with the plain and ordinary meaning of the terms and arbitrary, capricious and unreasonable: (1) new facility, existing facility, and change in use; (2) compelling public

interest; (3) geographic point of comparison; and (4) expansion of an existing facility.

A.  New Facility, Existing Facility and Change in Use

N.J.S.A. 13:1D-160(c) states that DEP "shall . . . deny a permit for a new facility" that creates a disproportionate impact in the OBC absent finding that facility will serve a compelling public interest.  (Emphasis added).  The EJLaw does not define "new facility" but states that DEP "shall adopt . . . rules and regulations to implement the provisions of this [A]ct."  N.J.S.A. 13:1D-161(a).

DEP defines a "new" facility in the EJRules as:  (1) "any facility that has not commenced operation" as of the EJRules' effective date; (2) "a change in use of an existing facility"; or (3) an existing facility that has been operating without "a valid approved registration or permit" from DEP prior to the EJRules' effective date.  N.J.A.C. 7:1C-1.5.  On the other hand, an "existing facility" is defined as the inverse of a "new" facility, that is, an operating facility or any portion which, as of the EJRules' effective date, "possesses a valid approved registration or permit from [DEP] for its operation or construction . . . ."  N.J.A.C. 7:1C-1.5.

As to change of use, N.J.A.C. 7:1C-1.5 states:  "Change in use" means "a change in the type of operation of an existing facility that increases the

facility's contribution to any environmental and public health stressor in an overburdened community, such as a change to waste processed or stored."

Appellants argue that "new facility" should not include previously existing facilities that undergo a qualifying "change in use" and those facilities that lacked legal approvals to operate before the effective date of the EJRules. Citing dictionary definitions, appellants assert that "new" refers only to a facility that has "recently come into existence" or was "not existing before." In essence, appellants seek to have existing facilities treated more like expansions and renewals, that is, without the mandatory denial provision that applies only to "new" facilities. See N.J.S.A. 13:1D-160 (c) and (d).

Although "new" can refer to a facility that has recently come into existence or was not existing before the EJRules, it can also mean "changed from the former state." Black's Law Dictionary 1249 (12th ed. 2024). Thus, it can mean an existing facility that has changed its use or operations or has been operating without valid approvals. In addition, DEP's definitions are supported by the Legislature's intent that a facility that generates new or different disproportionate impacts on the local community and those without a prior valid permit should be subject to the stricter new facility standard under N.J.S.A. 13:1D-160(c).

Additionally, the language added to "new facility" for an existing facility that has operated without a valid registration or permit prior to April 17, 2023, is necessary to ensure that delinquent facilities operating without agency oversight prior to the EJRules are not rewarded by being allowed the same benefits as existing facilities that were compliant with registration and permits. See 55 N.J.R. at 668. DEP explained in its responses to comments:

> The [DEP] considers facilities that have operated without the approvals required before the effective date of the rulemaking and avoided agency oversight to be out of compliance with State rules and, therefore, ineligible to receive the benefits afforded to existing facilities pursuant to the [EJLaw]. Considering recalcitrant facilities to be "new facilities" is consistent with the [EJLaw]'s intent to allow lawfully existing facilities to continue to operate while not rewarding facilities that have avoided regulatory review of their operations.
>
> [55 N.J.R. at 688.]

DEP also rejected the notion of a de minimus exception for an existing facility. 55 N.J.R. at 689.

Given the Legislature's intent to reduce environmental and public health stressor increases in OBCs, we are satisfied the DEP's reasoning for the definition of facilities is not arbitrary or capricious nor are the definitions themselves ultra vires. Further, those definitions are supported by the Legislature's intent to correct historical injustice, N.J.S.A. 13:1D-157, that a

23

facility generating new or different disproportionate impacts on the local community should be subject to the stricter new facility denial standard in N.J.S.A. 13:1D-160(c).

B. Compelling Public Interest

N.J.S.A. 13:1D-160(c) states that DEP "shall . . . deny a permit for a new facility" that creates a disproportionate impact "except that where [DEP] determines that a new facility will serve a compelling public interest in the community where it is to be located, [DEP] may grant a permit that imposes conditions on the construction and operation of the facility to protect public health." (Emphasis added). Therefore, the EJLaw provides a limited exception to its requirement of mandatory denial for any facility defined as a "new" facility. However, it does not define "compelling public interest" but states that DEP "shall adopt . . . rules and regulations to implement the provisions of this [A]ct." N.J.S.A. 13:1D-161(a).

DEP did so, and N.J.A.C. 7:1C-1.5 defines "compelling public interest" as

> a demonstration by a proposed new facility that primarily serves an essential environmental, health, or safety need of the individuals in an overburdened community, is necessary to serve the essential environmental, health, or safety need, and that there are no other means reasonably available to meet the essential environmental, health, or safety need. For purposes of this chapter, the economic benefits of the

24

proposed new facility shall not be considered in determining whether it serves a compelling public interest in an overburdened community.

[(Emphasis added).]

Additionally, "facilities that directly reduce adverse environmental and public health stressors in the [OBC] may be considered as serving an essential environmental, health, or safety need of the individuals in an [OBC]," N.J.A.C. 7:1C-5.3(c), and DEP may seek input from the public residing in the OBC and consider whether "there is a significant degree of public interest in favor of or against an application . . . ." N.J.A.C. 7:1C-5.3(d).

Appellants challenge the last sentence of the definition of "compelling public interest," arguing that excluding consideration of any economic benefits to the local OBC from a proposed new facility, such as employing local members of the community or increasing transactions with other local businesses, obstructs the intent of the EJLaw. In addition, appellants contend the exclusion of economic benefits is especially arbitrary since unemployment and education are assessed as public health stressors in the EJRules, and those stressors can make a community overburdened in the first instance. See N.J.A.C. 7:1C Appendix.

In responding to objectors regarding the proposed definition of "compelling public interest," DEP reasoned:

The [DEP] recognizes that facilities subject to the [EJLaw] may provide economic benefits, including, but not limited to, employment opportunities, tax ratables, and other financial incentives and encourages the continuation of mutually beneficial relationships between facilities and their host communities. However, [DEP] determined that not allowing the consideration of economic benefits as a basis for the siting of new regulated facilities (a narrow subset of potential development opportunities in an [OBC]) is necessary to meet the Legislature's statutory mandate to prioritize and improve the overall environmental, health, and economic well-being of individuals residing in [OBCs]. This is consistent with the Legislature's findings that: (1) adverse environmental and public health stressors impede the growth, stability, and long-term well-being of individuals and families living in [OBCs]; (2) the legacy of siting sources of pollution in [OBCs] continues to pose a threat to the health, well-being, and economic success of the State's most vulnerable residents; (3) it is past time for the State to correct this historical injustice; (4) no community should bear a disproportionate share of the adverse environmental and public health consequences that accompany the State's economic growth; and (5) that it is in the public interest for the State, where appropriate, to limit the future placement and expansion of such facilities in [OBCs]. N.J.S.A. 13:1D-157.

Employment and the improvement of environmental and public health conditions are not mutually exclusive, and the adopted rules seek to further both. The [EJLaw] requires the [DEP] to ensure that new facilities sought to be sited in [OBCs] do not cause, contribute to, or create disproportionate environmental and public health stressors unless necessary for a compelling public interest specific to the members of that community.

Accordingly, and consistent with the principle that exceptions to environmental and public health statutes are to be construed narrowly, the [DEP] has tailored the adopted regulations to provide a limited exception to the [EJLaw]'s mandatory denial requirement . . . An important part of this intentionally narrow tailoring is that a facility must primarily serve an essential environmental, health, or safety need of the individuals of an [OBC] to avoid the continued siting of facilities in [OBCs] that provide broad societal benefits on the pretext that those facilities also provide general benefits to members of the host community, which would only threaten to further historic siting inequities.

. . . After careful deliberation and extensive stakeholder discussion, the [DEP] reasonably determined that economic justifications, such as local hiring commitments or other promises of economic benefit, would be difficult, if not impossible, for the [DEP] to effectively quantify, appropriately condition, and meaningfully enforce, particularly in light of the [EJLaw]'s requirement that any benefits must be localized to the [OBC]. As compelling public interest serves as an exception to the [EJLaw]'s requirement of mandatory denial of siting new facilities that would contribute to adverse cumulative stressors, an inability to strictly enforce economic benefit conditions would threaten to undermine the statutory intent by allowing construction of facilities without certainty that the predicate requirements will continue to be met.

Consistent with the Legislative intent to reduce the environmental and public health stressors within [OBCs] due to historic inequities in facility siting, notwithstanding the economic benefits associated with such facilities, the compelling public interest standard allows the [DEP] to consider whether a proposed facility, such as a public works project, would directly reduce adverse environmental or public health

27

stressors in the host [OBC], thereby serving an essential environmental, health, or safety need of the host [OBC] and provides an appropriate pathway to allow projects that address host community needs, such as appropriately scaled food waste facilities, public water infrastructure, renewable energy facilities, and projects designed to reduce the effects of combined sewer overflows. While the adopted rules prohibit the consideration of economic benefits as the basis for the [DEP]'s decision to grant a compelling public interest exception, they specifically allow the consideration of support for a project in the [OBC] in determining whether a compelling public interest is present to ensure its decisions meet the needs of community members.

[55 N.J.R. at 670-71 (alteration and citation omitted).]

Based on DEP's reasoning and the Legislature's intent, DEP's decision not to include economic factors in the definition of compelling public interest is not arbitrary or capricious. It is reasonable for DEP to exclude these factors even though unemployment is counted as a localized stressor because, as DEP found and stakeholders confirmed, promises of economic benefit are difficult to quantify during the application review process and before the proposal is finished, and difficult to enforce. 55 N.J.R. at 671. In fact, DEP explained that sometimes economic factors are not directly tied to the local community:

For example, the construction or expansion of a facility in an [OBC] may not necessarily employ those people living in its host community. Similarly, a facility built <u>outside</u> of an [OBC] may still offer employment opportunities to people who live in [OBCs]—and, if so, it could in fact work to reduce

28

that community's unemployment rate, potentially reducing adverse cumulative stressors and, in turn, making it easier for future facilities to avoid a disproportionate impact.

[55 N.J.R. at 673 (emphasis in original).]

Appellants contend that other environmental laws and regulations require balancing environmental or public-health interests with the State's economic development and growth, citing to N.J.S.A. 13:9B-11 of the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1. We don't disagree.

However, the Legislature's decision not to require such balancing here is evident from the omission of any such requirement in the EJLaw. "It is the Legislature's prerogative to impose a requirement in one context but not another; it is our duty to treat that distinction as meaningful.'" State v. Ryan, 249 N.J. 581, 599 (2022). Moreover, to make sure that such conflicts do not occur, DEP adopted N.J.A.C. 7:1C-1.4 governing the relationship of the EJRules to other regulatory programs. N.J.A.C. 7:1C-1.4(b) states: "In the event of a conflict between this chapter and another [DEP] rule, this chapter shall supersede, except that this chapter shall not supersede any provision required to comply with Federal law."

And, as amicus CWA notes, it is clear from the Legislature's intent in N.J.S.A. 13:1D-157 that it requires prioritizing the health, safety, and environmental needs of the individuals in OBCs and that neither DEP nor

applicants for approvals are allowed to trade fewer pollution reductions for more jobs and tax rateables.

DEP's definition of compelling public interest is not ultra vires, does not conflict with other laws, and is not arbitrary or capricious.

C. Geographic Point of Comparison

The EJLaw requires DEP, "[n]otwithstanding the provisions of any other law, or rule or regulation . . . to the contrary," to deny a permit application for a new facility, absent a compelling public interest, and impose conditions on an existing facility's expansion permit if triggered upon a finding that the permit would "cause or contribute to adverse cumulative environmental or public health stressors in the [OBC] that are higher than those borne by other communities within the State, county, or other geographic unit of analysis as determined by [DEP] pursuant to rule, regulation, or guidance adopted or issued . . . ." N.J.S.A. 13:1D-160(c) and (d) (emphasis added). As above, the EJLaw authorized DEP to "adopt . . . rules and regulations to implement [its] provisions. . . ." N.J.S.A. 13:1D-161(a).

N.J.A.C. 7:1C-1.5 defines "[g]eographic point of comparison" as

> the comparison area and value used to determine whether an [OBC] is subject to one or more adverse environmental and public health stressors and is determined by selecting the lower value of the State or county's 50th percentile, calculated excluding the values of other [OBCs]. For the purposes of this

30

definition, "county" shall refer to the county in which the [OBC] is located.

Appellants first argue that the definition is ultra vires because DEP has not used a recognized, existing and contiguous geographic unit of analysis for its comparison, especially because the EJLaw uses the phrase "within the State, county." We are unpersuaded.

The plain language of the EJLaw under N.J.S.A. 13:1D-160(c) and (d) clearly gives DEP vast discretion in determining geographic comparisons. Furthermore, the Legislature used the words "or other" in the phrase "other communities within the State, county, or other geographic unit of analysis" in both N.J.S.A. 13:1D-160(c) and (d), which indicates the Legislature is allowing DEP to choose an alternative to the well-defined geographic units of State and county.

Nevertheless, appellants also contend that DEP's definition and use of the "50th percentile" is arbitrary and capricious and should have been based only on a recognized county-wide or state-wide geographical approach for comparison, that is, a more one-size-fits-all approach. They assert the definition will result in finding disparate impacts because urban communities will always be compared to rural communities and other pristine areas.

31

In its responses to comments, DEP explained why a "one-size-fits-all" approach would not provide the most equitable protection to OBCs as intended by the EJLaw, stating:

> After analyzing several different approaches, including considering State, county, and region alone, the [DEP] determined that a single point of comparison or "one-size-fits-all" approach would not provide the most equitable protection to [OBCs], as is intended by the [EJLaw]. For instance, using only a county point of comparison would threaten to perpetuate the historic siting inequities the Legislature sought to remedy by providing less consistent protection in the State's comparatively more industrialized counties. Conversely, focusing on a strict Statewide comparison would provide less protection to [OBCs] in comparatively less industrialized counties, particularly in the State's southern regions. Similarly, analysis of more regionalized approaches lacked uniformity and a coherent basis for boundary determination. In this way, the [DEP]'s approach attempts to better balance differences between urban and rural environments in its analysis.
>
> The [DEP] has, therefore, decided to use a hybrid approach that compares the environmental and public health stressor values of an [OBC] to the State or county's 50th percentile and selects the lower value as the appropriate geographic point of comparison.

[55 N.J.R. at 700.]

DEP's selection of the 50th percentile for comparison is consistent with the EJLaw's requirement in N.J.S.A. 13:1D-160 that DEP determine whether environmental and public health stressors are "higher than those borne by other

communities within the State." The EJLaw does not mention "averages." The straightforward case-specific assessment of the data leaves little room for interpretation over whether a community is already adversely impacted and in need of the additional protections provided under the EJRules. 55 N.J.R. at 700.

For the reasons stated, DEP's definition of geographic point of comparison is not ultra vires, does not conflict with other laws, and is not arbitrary or capricious.

### D. Expansion of Existing Facility

N.J.S.A. 13:1D-157 states that "it is in the public interest for the State, where appropriate, to limit the future . . . expansion of . . . facilities in [OBCs]." Accordingly, the EJLaw supplements existing environmental laws by requiring applicants seeking approval for expansion of an existing facility to also comply with EJLaw requirements if that facility is located, in whole or in part, in an OBC and the proposal would "cause or contribute to adverse cumulative environmental or public health stressors in the [OBC] that are higher than those borne by other communities . . . ." N.J.S.A. 13:1D-157; N.J.S.A. 13:1D-160(d). In those instances, DEP must issue an approval for the expansion with conditions "concerning the construction and operation of the facility to protect public health . . . ." N.J.S.A. 13:1D-160(d). That is, unlike

33

new facilities, DEP cannot deny its approval for expansion of an existing facility under the EJLaw. However, there is an exemption "for a minor modification of a facility's major source permit for activities or improvements that do not increase emissions." N.J.S.A. 13:1D-158. Again, the EJLaw does not define "expansion" but leaves the adoption of rules and regulations for the implementation of the law to DEP. N.J.S.A. 13:1D-161(a).

N.J.A.C. 7:1C-1.5 defines "expansion" as

> a modification or expansion of existing operations or footprint of development that has the potential to result in an increase of an existing facility's contribution to any environmental and public health stressor in an [OBC], but shall not include any such activity that decreases or does not otherwise result in an increase in stressor contributions.
>
> [(Emphasis added).]

Appellants argue that the words "modification" and "potential" will trigger the EJLaw for any change less than a certain expansion, and that "modification" makes the definition too broad because expansion can mean both expanding the physical footprint of an existing facility and expanding its operations or impact.

The Legislature's stated intent, however, is for the EJIS process to address changes to existing facilities that "cause or contribute to adverse . . . stressors," N.J.S.A. 13:1D-160(d), and that "have the potential to increase"

those stressors, N.J.S.A. 13:1D-157, including from environmental pollution that "may cause potential public health impacts," N.J.S.A. 13:1D-158. Because the EJLaw focuses on stressors, not only on physical construction, DEP reasonably requires an "expansion" to cover expansions of an existing facility's operations, its footprint, and its potential impacts. This is further supported by the definition of "expand," which means "to increase the extent, number, volume, or scope of." Merriam Webster's Collegiate Dictionary 439 (11th ed. 2014).

Furthermore, "modification" means "[a] change to something; an alteration or amendment." Black's Law Dictionary 1200 (12th ed. 2024). Therefore, contrary to appellants' claims, an applicant is subject to the EJLaw only if the change or "modification" or expansion requires a permit under a separate law. N.J.S.A. 13:1D-158. Moreover, the Legislature exempted "any authorization or approval necessary to perform a remediation" and "any authorization or approval required for a minor modification of a facility's major source permit . . . that do[es] not increase emissions." N.J.S.A. 13:1D-158.

DEP explained its reasoning in its responses to comments:

> The commenters['] speculation that any change in facility operations would require [DEP] review fails to consider whether those operations require a new permit or modification to an existing permit, which is

necessary to trigger applicability of the rules. More specifically, the definition of covered permits pursuant to the adopted rules excludes "minor modification of a facility's major source permit for activities or improvements that do not increase emissions," while the definition of facility expansions similarly excludes "any such activity that decreases or does not otherwise result in an increase in stressor contributions." The [DEP], therefore, does not anticipate these provisions will discourage facility upgrades or the incorporation of new technologies.

[55 N.J.R. at 687.]

By applying permitting conditions to existing facilities which increase stressors through modification of their operations, DEP effectuates the intent and purpose of the EJLaw. Therefore, DEP's definition of expansion is not ultra vires, overbroad or vague.

IV.

We turn to appellants' contention that the extension of the EJRules to "zero population blocks" is ultra vires because it impermissibly increases the geographic reach of the EJLaw.

N.J.S.A. 13:1D-158 defines "[OBC]" as "any census block group" whose population meets certain demographic criteria provided the other criteria regarding pre-existing cumulative stressors are also met. N.J.S.A. 13:1D-160(a) states that the EJLaw applies "if the facility is located, or proposed to be located, in whole or in part, in an [OBC]" and that the applicant must

prepare an EJIS that assesses, among other things, "the environmental or public health stressors already borne by the [OBC] as a result of existing conditions <u>located in or affecting</u> [that OBC]."  (Emphasis added).

The EJRules repeat the definition of "[OBC]" in N.J.A.C. 7:1C-1.5.  In addition, DEP added N.J.A.C. 7:1C-2.1(e), which states:

> Where an existing or proposed facility in a block group that has <u>zero population</u> is located <u>immediately adjacent</u> to an [OBC], the existing or proposed facility shall be subject to the requirements of this chapter and shall utilize the highest combined stressor total of any immediately adjacent [OBC] for the purposes of this chapter.  For the purposes of this section, immediately adjacent means may include those communities separated by a street, road, or right-of-way.
>
> [(Emphasis added).]

Appellants contend the EJLaw limits its applicability to facilities located in OBCs, and DEP has impermissibly enlarged the law by treating zero population block groups that share any physical border with an OBC in the same manner.  They claim that a census block that has no residents does not meet the definition of an OBC.

In its response to comments on this issue, DEP provided a detailed explanation as to why it made various changes to its proposed rule in N.J.A.C. 7:1C-2.1(e) before adoption.  It stated:

> [T]he Legislature has directed the [DEP] to work to address the disproportionate impacts to environmental

A-2936-22

and public health conditions historically borne by [OBCs]. It is, therefore, entirely consistent with the [EJLaw] to require heightened analysis of operations of covered facilities located in zero population block groups where those facilities are immediately adjacent to an [OBC] and, therefore, likely to present similar impacts to environmental and public health stressors as those located directly in the community. This is particularly important considering how block group boundaries can be manipulated during the census process for a myriad of purposes unrelated to the protections sought by the [EJLaw], depriving communities of protections. The Legislature could not have reasonably intended to exempt such facilities from analysis of their potential impacts to public health and the environment in those immediately adjacent areas. The [DEP] intends to ensure the continued protection of communities even if census block data and boundaries are reconfigured to have zero population in the future.

The framework of the adopted rules is, therefore, designed to ensure that the statutory mandate is achieved by requiring facilities in zero population block groups that are located immediately adjacent to [OBCs] are reviewed and subject to standards that ensure that impacts to adjacent [OBCs] are taken into account and any necessary permit conditions imposed to protect those communities from disproportionate impacts. To the extent that facilities in zero population census blocks are located immediately adjacent to statutorily defined [OBCs], the operations of new or existing facilities in the zero population block groups have similar potential to impact environmental and public health stressors as those located directly in the [OBC] that would not otherwise be considered. As suggested by one commenter, this inclusion of adjacent zero population block groups provides an opportunity for a facility in a zero population block group to demonstrate that its

38

operations will not impact environmental and public health stressors in the adjacent [OBC].

. . . To clarify that the [DEP] was not intending to expand the definition of [OBCs] beyond what is set forth in the [EJLaw], the [DEP] is clarifying N.J.A.C. 7:1C-2.1(e) upon adoption to provide that [OBCs] covered by the rules are those covered by the [EJLaw], as defined at N.J.S.A 13:1D-157, but that facilities in zero block groups immediately adjacent to [OBCs] will require review pursuant to the proposed rules.

Additionally, the [DEP] agrees with commenters who suggest that the proposed language could potentially work at cross-purposes with zoning approaches that seek to create dedicated industrial or commercial zones or enhanced, protective buffers between those areas and residential populations. Accordingly, and consistent with its intent to ensure impacts of adjacent facilities are analyzed and considered, the [DEP] is further clarifying N.J.A.C. 7:1C-2.1(e) upon adoption to provide that only those facilities in a zero-population block group that are sited immediately adjacent (that is, shares a border with the OBC block group) to residential areas of an [OBC] will be subject to the requirements of the chapter. The [DEP] expects that this clarification will incentivize more protective zoning practices and the creation of protective buffers between facilities and neighboring communities. The [DEP]'s intent, for example, was not to require a facility located in the far corner of a zero-population block group, removed and buffered from an adjacent residential community, to be subject to the proposed rules.

[55 N.J.R. at 703.]

As a result, the EJLaw regulates facilities located "in whole or in part" in an OBC and that will impact "the environmental or public health stressors already borne by the [OBC] as a result of existing conditions located in or affecting [that OBC]." N.J.S.A. 13:1D-160(a). Because that statutory language applies to a facility located "in part" in an OBC and requires assessment of stressors "located in or affecting" the OBC, N.J.A.C. 7:1C-2.1(e) is not ultra vires because it applies the EJLaw to a facility located in a zero-census block that immediately and directly borders the OBC.

Furthermore, DEP stated in its responses that consistent with N.J.S.A. 13:1D-159, it will update its list of OBCs "at least every two years utilizing the most recent ACS [(American Community Survey Data)] release." 55 N.J.R. at 702. Thus, this data will not be static. If there is any change, DEP will "notif[y] all municipalities of the OBC status changes in their borders." Ibid. We are satisfied DEP's extension of the EJRules to "zero population blocks" was not ultra vires because it followed the intent and language of the EJLaw.

V.

We next address appellants' contentions that DEP adopted permit conditions and impact control measures in the EJRules that exceed its statutory authority in the EJLaw, are unconstitutionally vague, and are arbitrary, capricious, and unreasonable. We disagree and conclude the permit conditions

40                                                                                    A-2936-22

provide DEP with the necessary flexibility to weigh the particular circumstances of each proposal, facility and OBC.

A. Permit Conditions/Control Measures

As explained earlier, the EJLaw requires DEP to "deny a permit for a new facility" if it finds that the approval "as proposed, would, together with other environmental or public health stressors affecting the [OBC], cause or contribute to adverse cumulative environmental or public health stressors in the [OBC] that are higher than those borne by other communities . . . except that where the [DEP] determines that a new facility will serve a compelling public interest in the community," DEP "may grant a permit that imposes conditions on the construction and operation of the facility to protect public health." N.J.S.A. 13:1D-160(c) (emphasis added). In addition, DEP "may . . . apply conditions to a permit for the expansion of an existing facility, or the renewal of an existing facility's major source permit, concerning the construction and operation of the facility to protect public health . . . ." N.J.S.A. 13:1D-160(d) (emphasis added).

To implement the EJLaw as required by N.J.S.A. 13:1D-161, DEP declared that an applicant seeking approval for a new facility or expansion of an existing facility "that is proposed to be located, in whole or in part, in an [OBC] that is subject to adverse cumulative stressors shall analyze and

41

propose all control measures necessary to avoid facility contributions to all adverse environmental and public health stressors in the [OBC]." N.J.A.C. 7:1C-5.2(a) and -6.2(a). Where the proposed control measures cannot avoid a disproportionate impact, for new facilities, DEP can deny the permit or adopt permit conditions, but for expansions, DEP can only adopt permit conditions. N.J.A.C. 7:1C-5.2(b) and (c); N.J.A.C. 7:1C-6.2(b) and (c).

For those conditions, DEP adopted regulations requiring the permit applicants themselves to "propose" various "feasible" control measures. N.J.A.C. 7:1C-5.4(b) and -6.3(b). "'Feasible' means measures addressing contributions to environmental or public health stressors that are reasonably capable of being accomplished by taking into account economic and technological factors." N.J.A.C. 7:1C-1.5.

For new facilities, N.J.A.C. 7:1C-5.4(b), and existing facility expansions, N.J.A.C. 7:1C-6.3(b), the EJRules state that:

> the applicant shall propose control measures <u>in the following order</u>:
>
> 1. <u>All</u> feasible measures to avoid facility contributions to environmental and public health stressors;
>
> 2. For any contribution that cannot feasibly be avoided, all feasible <u>onsite</u> measures to minimize facility contributions to environmental and public health stressors;

A-2936-22

3. All feasible <u>offsite</u> measures within the [OBC] to reduce environmental and public health stressors <u>to which the facility will contribute</u>;

4. All feasible <u>offsite</u> measures within the [OBC] to reduce adverse environmental and public health stressors <u>to which the facility will not contribute</u>, with preference for the reduction of stressors from highest to lowest percentile in relation to the geographic point of comparison; and

5. All feasible <u>offsite</u> measures within the [OBC] to provide a net environmental benefit in the [OBC].

[N.J.A.C. 7:1C-5.4(b) (emphasis added); N.J.A.C. 7:1C-6.3(b) (emphasis added).]

Thereafter, if DEP "determines that the facility will avoid a disproportionate impact, the [DEP] shall authorize the applicant to proceed with the imposition of conditions set by the [DEP][,] as necessary to ensure a disproportionate impact is avoided." N.J.A.C. 7:1C-9.2(a). If DEP's review "determines that the facility cannot avoid a disproportionate impact," it will set necessary permit conditions "to avoid or minimize contributions to adverse environmental and public health stressors, reduce adverse environmental and public health stressors, or provide a net environmental benefit in the [OBC]." N.J.A.C. 7:1C-9.2(b)(1)(ii) and (2). For new facilities, DEP also has the option of simply denying the permit. N.J.A.C. 7:1C-9.2(b)(1)(i).

Further, in making its decision pursuant to N.J.A.C. 7:1C-9.2, DEP shall:

1. Determine whether the facility will avoid a disproportionate impact to an [OBC];

2. Evaluate and determine the feasibility of conditions on the construction or operation of the facility . . . and such evaluation shall not be limited to those conditions proposed by the applicant;

3. Evaluate conditions on the construction or operation of the facility . . . which evaluation shall not be limited to those conditions proposed by the applicant; and

4. Impose conditions selected by the [DEP] after being evaluated pursuant to (b)2 and 3 above, on the construction or operation of the facility.

[N.J.A.C. 7:1C-9.1(b).]

Appellants argue that N.J.A.C. 7:1C-5.4(b) and -6.3(b) are ultra vires because the EJLaw does not envision DEP imposing offsite control measures or other measures that are unrelated to the construction or operation of the applicant's facility. We disagree, again noting DEP's responses to comments, in which it combined the language in N.J.S.A. 13:1D-160(c) with the intent of the EJLaw and the language in its other provisions.

DEP stated:

N.J.S.A. 13:1D-160 provides the [DEP] with the authority to impose conditions on the construction or operation of the facility, as necessary, to protect public health. Further, the intent of the [EJLaw] is to reduce environmental and public health stressors in [OBCs] through the appropriate conditioning of

44

construction and operating permits for covered facilities.

To do so, the [DEP] created a hierarchy for facilities to follow in considering and proposing feasible control measures . . . .

Pursuant to the adopted rules, a facility is charged with analyzing and proposing feasible measures to avoid and, where avoidance is not feasible, minimize contributions to environmental and public health stressors in a hierarchical method that prioritizes avoidance and minimization of direct facility contributions. Pursuant to the rulemaking, an applicant will be required to analyze and propose all feasible measures to avoid direct facility contributions to environmental and public health stressors. For contributions that cannot be avoided, the facility must propose any feasible onsite measures to minimize facility contributions.

. . . .

For new and expanded facilities that cannot avoid contributions to adverse stressors, the [DEP] would require facilities to consider additional measures that may be implemented within a community to reduce offsite adverse environmental and public health stressors in the [OBC] . . . . This requirement is appropriate and consistent with the [EJLaw]'s direction to seek to avoid impacts to adverse environmental and public health stressors and the [DEP]'s authority to impose conditions to the permit "necessary in order to avoid or reduce the adverse environmental or public health stressors affecting the [OBC]." N.J.S.A. 13:1D-160(a)(1) and (3). Accordingly, if it is determined that the facility cannot avoid adverse stressor impacts in its host community, analyses and proposal of additional offsite

45

measures is warranted to address unavoidable impacts of new and expanded facilities.

[55 N.J.R. at 718.]

In attempting to discover legislative intention in any law, a reviewing court can "take into consideration the entire scheme of which a provision is a part." Rozenblit v. Lyles, 245 N.J. 105, 122 (2021) (quoting Headen v. Jersey City Bd. of Educ., 212 N.J. 437, 450-51 (2012)). "In reading '[a]n enactment that is part of a larger statutory framework,' [courts] are mindful of that context 'so that a sensible meaning may be given to the whole of the legislative scheme.'" Ibid. (quoting Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012)). A reviewing court "may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." N.J. Guild of Hearing Aid Dispensers, 75 N.J. at 562.

Moreover, while an administrative agency's actions must not exceed the powers conferred to it by the Legislature, "the breadth of an agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer." In re Application of Virtua-W. Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422-23 (2008). Agencies are therefore "allowed some leeway to permit them to fulfill their assigned responsibilities." Id. at 423.

Applying these principles, N.J.A.C. 7:1C-5.4(b) and -6.3(b) are not ultra vires because those regulations, read liberally together with the intent of the EJLaw and its other statutory provisions, envision DEP imposing offsite control measures and other measures unrelated only to the construction or operation of the applicant's facility itself.

Appellants further contend that those EJRules together with N.J.A.C. 7:1C-9.2 are vague and therefore violate due process by failing to provide the regulated public with clear standards or criteria that DEP will use to determine which control measures are sufficient for approvals. We are unconvinced.

N.J.A.C. 7:1C-9.2 sets out the steps DEP will take when making its final decision, including its evaluation of the permit conditions proposed by the applicant and those not proposed. While DEP is not bound to accept an applicant's proposal, N.J.A.C. 7:1C-9.2(b), the process will likely allow applicants to anticipate the kinds of permit conditions they might ultimately receive since the applicants must first propose those conditions themselves and may then engage with DEP as needed before any final permit decision.

Indeed, upon request, DEP "shall provide to the applicant the initial screening information for the [OBC] . . . identifying the environmental and public health stressors, the geographic point of comparison, any adverse

A-2936-22

environmental and public health stressors, and whether the [OBC] is subject to adverse cumulative stressors." N.J.A.C. 7:1C-2.2(a) and -2.3.

As DEP stated in its responses to commenters:

> This analysis [of permit conditions] will be fact-sensitive and facility-specific so it would be impossible for the [DEP] to accurately define all potential conditions, but the [DEP] expects facilities will consider additional control technologies, enhanced stressor control plans, electrification of operations (including associated mobile sources) immediately or over a period of time, adjustments to traffic patterns to avoid residential areas, and other innovative technological and operating solutions.
>
> [55 N.J.R. at 718.]

Accordingly, the regulations are sufficiently definite to inform the relevant party as to what is required while, simultaneously, flexible enough to accommodate the day-to-day reviews. In re Health Care Admin. Bd., 83 N.J. at 82-83. The EJRules are not vague, as they provide fair notice of the requirements to applicants while DEP retains the necessary flexibility to proceed on an individual basis weighing the particular circumstances of each proposal.

B. Localized Impact Control Technology for Major Sources

As explained earlier, the EJLaw applies as an overlay to applicants seeking a new major source permit, an expansion or a renewal of an existing facility's major source permit, that is, certain air pollution permits. N.J.S.A.

13:1D-158. In fact, the EJLaw's definition of "facility" includes a "major source of air pollution," and the definition of "major source" incorporates the federal Clean Air Act (CAA), 42 U.S.C. 7401 to -7671q and New Jersey's Air Pollution Control Act (APCA), N.J.S.A. 26:2C-1 to -68, and means a facility "which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant, or other applicable [pollutant] criteria set forth in the federal [CAA] . . . ." N.J.S.A. 13:1D-158.

To implement the EJLaw as required by N.J.S.A. 13:1D-161, DEP created and adopted the "Localized Impact Control Technology" (LICT) in N.J.A.C. 7:1C-7.1, a new detailed process that addresses air-pollution-specific control measures and permit conditions for approvals relating to new major sources and expansions of existing major sources. The LICT does not apply to all major source applications but is only applicable when control measures are required for: (1) "a proposed new major source facility that seeks to demonstrate a compelling public interest," N.J.A.C. 7:1C-5.4(a); and (2) expansion of an existing major source facility, N.J.A.C. 7:1C-6.3(a). In fact, the LICT provisions solely concern air pollution controls, which contrasts with the broader N.J.A.C. 7:1C-5.4(b) and -6.3(b) provisions requiring applicants to propose control measures across all environmental and public health stressors. 55 N.J.R. at 719.

A-2936-22

Nevertheless, as with other control measures, it is the applicant that must first propose control measures by "document[ing]" how it will comply "with the LICT standard" for its major source proposal.  N.J.A.C. 7:1C-7.1(c).  Indeed, according to N.J.A.C. 7:1C-7.1(b), LICT documentation "is required only for an air contaminant for which the facility's potential to emit" is at thresholds specified in the APCA or listed at N.J.A.C. 7:1C-7.1(a)(2).

The LICT documentation process is characterized as "a top-down approach" and is set forth in N.J.A.C. 7:1C-7.1(c).  The applicant initially "identif[ies] and evaluat[es] a list of air pollution control technologies or measures that may be applied to the source to reduce each contaminant . . . ." N.J.A.C. 7:1C-7.1(c)(1).  Next, the applicant "[a]rrange[s] the measures . . . in descending order of air pollution control effectiveness."  N.J.A.C. 7:1C-7.1(c)(2).  The "first-listed or 'top' measure shall constitute LICT for the source" unless that measure:  (1) is "technically infeasible, based on physical, chemical, or engineering principles, and/or technical difficulties that would prevent the successful application of the measure"; (2) has adverse "environmental impacts . . . when compared with its air contaminant emission reduction benefits," thereby making its use "unreasonable"; or (3) has similar or greater "energy" usage-related tradeoffs as the proposed measures.  N.J.A.C. 7:1C-7.1(c)(2)(i) to (iii).  In any of those instances, the applicant proceeds to

A-2936-22

the next measure in the list, until it reaches one that is not eliminated from consideration. N.J.A.C. 7:1C-7.1(c)(3).

ELEC argues that the creation and use of the LICT is ultra vires and impermissibly conflicts with the APCA, and that the LICT is also arbitrary, capricious and unreasonable because it is indefinite and vague. We disagree.

Under the APCA, the Legislature establishes the governing performance standards for air pollution control in New Jersey. N.J.S.A. 26:2C-9.2. Specifically, the APCA requires that "[n]ewly constructed, reconstructed, or modified equipment and control apparatus shall incorporate advances in the art of air pollution control as developed for the kind and amount of air contaminant emitted by the applicant's equipment and control apparatus . . . ." N.J.S.A. 26:2C-9.2(c). That is, applicable performance standards required by the APCA depend on the equipment, apparatus and type of air contaminant, and could include criteria from, for example, the "reasonably available control technology" adopted by DEP, the federal "lowest achievable emission rate", the federal "best available control technology," the federal "maximum achievable control technology," or the "new source performance standards" adopted by DEP. N.J.S.A. 26:2C-9.2; N.J.A.C. 7:27-34.3; N.J.A.C. 7:27-22.35(b)(1); N.J.A.C. 7:27-18.3. Additionally, DEP's air pollution control regulations implementing the APCA require that "[i]f an application proposes

A-2936-22

construction, installation, reconstruction, or modification of equipment and control apparatus that is a significant source meeting the following criteria, the applicant shall document state-of-the-art (SOTA) for the source." N.J.A.C. 7:27-8.12(a).

After review, we are satisfied that the LICT is tailored to meet the EJLaw's requirement to reduce emissions in OBCs from new and expanding facilities as much as possible and "correct" the "historical injustice" of environmental inequality that persists despite the successes of other environmental laws. N.J.S.A. 13:1D-157. Further, the Legislature required DEP to impose permit conditions "[n]otwithstanding the provision of any other law." N.J.S.A. 13:1D-160(d); see Jersey City v. State Dep't of Env't Prot., 227 N.J. Super. 5, 20 (stating "notwithstanding" clause part of "clear evidence of legislative intent to give DEP discretion").

Indeed, in DEP's EJRules proposal, it stated that the

> LICT, like SOTA, is intended to minimize the degradation of air quality from new sources, improve air quality when existing sources are replaced or reconstructed, and promote enhanced pollution prevention, thereby reducing stressors in [OBCs]. . . . However, LICT would focus on technical feasibility rather than economic feasibility or cost-effectiveness in determining appropriate control technologies. This reflects the [DEP]'s goal to reduce emissions from new and expanding facilities as much as possible to reduce environmental and public health stressors in [OBCs]. The [DEP] would assess sources on a

52

facility-wide level to accomplish the [EJLaw]'s goal of properly addressing potential contributions to environmental and public health stressors for new and expanded facilities in [OBCs].

[54 N.J.R. at 986.]

DEP further explained in its responses to comments on the LICT that

[t]he purpose of the LICT standard is consistent with the law's intent to address pollution in "low-income communities and communities of color [that] have been subject to a disproportionately high number of environmental and public health stressors . . . [.]" N.J.S.A. 13:1D-157.

The LICT standard is based on the State of the Art (SOTA) standard at N.J.A.C. 7:27-8.12 for minor facilities and N.J.A.C. 7:27-22.25 for major facilities, but does not include consideration of economic feasibility. Additionally, under the new LICT standard, as explained in the notice of proposal Summary, 54 N.J.R. 986, the [DEP] will "assess sources on a facility-wide level to accomplish the [EJLaw]'s goal of properly addressing potential contributions to environmental and public health stressors for new and expanded facilities in [OBCs]." Thus, consistent with the [EJLaw], a proposed new or expanded facility will trigger the LICT requirement based on the facility's emissions, rather than emissions at a specific source at the facility.

[55 N.J.R. at 720 (second alteration in original).]

DEP provided an example in the response to demonstrate its reasoning for the LICT.

We are satisfied DEP did not exceed its authority in creating and using the LICT. Further, there is no conflict between the LICT and the APCA's standards because the LICT focuses on technical feasibility rather than economic feasibility or cost effectiveness in determining the appropriate control technologies to reduce emissions from new major sources and expansions of existing major sources in order to reduce environmental and public health stressors in OBCs. When "construing statutes relating to the same subject matter," a court "must strive to harmonize them." Burt v. W. Jersey Health Sys., 339 N.J. Super. 296, 304 (App. Div. 2001).

We also conclude the LICT standard is not arbitrary and capricious because the EJRules provide DEP with the necessary flexibility to proceed on an individual basis weighing the particular circumstances of each proposal, facility and OBC. The regulation matches the Legislature's remedial and preventative goals articulated in the EJLaw.

## VI.

Appellants contend DEP's identification of and methods of measuring environmental and public health stressors in the EJRules are contrary to the EJLaw and its legislative intent and are arbitrary, capricious, and unreasonable. We disagree.

54

The EJLaw does not provide a strict definition of "stressors" in N.J.S.A. 13:1D-158 and, instead gave DEP the flexibility to adopt guidelines regulating applicants in N.J.S.A. 13:1D-161(a). Its "quality of life" stressors are supported by the record and are not arbitrary, capricious or unreasonable.

As stated, the EJLaw seeks to remedy stress in OBCs resulting from the historic siting of industrial facilities. N.J.S.A. 13:1D-157. To address this historic issue, the Legislature established a procedure by which certain types of facilities seeking environmental approvals would evaluate their potential impact on environmental or public health stressors. The EJLaw defines "environmental or public health stressors" as (1) "sources of environmental pollution, including, but not limited to, concentrated areas of air pollution, mobile sources of air pollution, contaminated sites, transfer stations or other solid waste facilities, recycling facilities, scrap yards, and point-sources of water pollution"; or (2) "conditions that may cause potential public health impacts, including, but not limited to, asthma, cancer, elevated blood lead levels, cardiovascular disease, and developmental problems in the [OBC]." N.J.S.A. 13:1D-158 (emphasis added).

After "a comprehensive stakeholder process and internal in-depth analysis," 55 N.J.R. at 709, followed by notice and comment and its "comprehensive analysis," DEP identified twenty-six stressors in eight

categories that it found were "supported by robust, high-quality, Statewide, publicly available datasets that are meaningful at a census block group level." 55 N.J.R. at 704. DEP also "engaged stakeholders in determining the threshold above which any individual stressor . . . triggers a determination of adversely stressed, and determined the 50th percentile or median level provided the best protection for those communities," and this "assessment of the data offer[ed] clarity regarding whether a community is already adversely impacted." 55 N.J.R. at 704.

The selected eight categories of stressors adopted are: (1) "Concentrated Areas of Pollution"; (2) "Mobile Sources of Air Pollution"; (3) "Contaminated Sites"; (4) "Transfer Stations or Other Solid Waste Facilities, Recycling Facilities, and Scrap Metal Facilities"; (5) "Point-Sources of Water Pollution"; (6) "May Cause Potential Public Health Impacts"; (7) "Density/Proximity Stressors"; and (8) "Social Determinants of Health." 55 N.J.R. at 742-43. The eight categories of twenty-six separate stressors and the way in which they are measured, and their data sources are found in the Rule Appendix to N.J.A.C. 7:1C. 54 N.J.R. at 1000-01; 55 N.J.R. at 742-43.

In its responses to comments, DEP stated that

> the primary role of the [DEP]'s environmental and public health stressors is to establish a baseline of relevant impacts already affecting OBCs to compare against non-OBC median county and State values.

While these stressors could be made worse by the addition[] or expansion of a new facility, they might not be impacted.  Regardless, the inclusion of these stressors in the baseline and comparative analysis provides a clear and objective picture of environmental and public health conditions each community in the State is currently facing.

[55 N.J.R. at 712.]

DEP explained it

selected the [twenty-six] stressors included in New Jersey's comparative assessment, in part, because of the availability of robust, Statewide, publicly available data that was meaningful at a block group level.  In addition, the [DEP] is committed to reviewing and updating, if available, the data supporting these stressors twice a year.  The data for each stressor is unique in terms of its collection/development methodology and timetable, with some data . . . gathered through a Federally approved monitoring network, while other data like traffic comes from projected Federal sampling and still other stressors (for example, potential of lead-based paint) rely on surrogate data to make an approximation.  If better data becomes available, the [DEP] will consider making changes to its stressor methodology.  However, the [DEP] does not have the resources to do ongoing independent studies related to each stressor, and that data would likely be less accurate (that is, based on a smaller sample size) than the current data sources.  In terms of the baseline set by EJMAP, the [DEP]'s environmental justice goal is to ensure that OBCs are no worse off for any stressor than their non-OBC counterparts.  The [DEP] overall goal is to continue reducing the environmental threats represented by these stressors Statewide, and the various program areas throughout the [DEP] (for example, Air Quality, Water Quality, etc.) have

established standards that are continuously revisited to ensure that baseline continues to improve. As that non-OBC bar continues to lower, so too will the baseline that the OBCs must meet.

[55 N.J.R. at 707.]

Appellants contend DEP exceeded its statutory authority and expertise by requiring the assessment of stressors that concern "quality of life" issues— specifically "May Cause Potential Health Impacts" and "Social Determinants of Health." They assert DEP has not demonstrated how such stressors relate to the EJLaw's required assessment of "sources of environmental pollution" or a facility's impact on a community, or of public health or the "conditions that may cause potential public health impacts" such as asthma, cancer, elevated blood lead levels, cardiovascular disease, and developmental problems. N.J.S.A. 13:1D-158.

Appellants misinterpret N.J.S.A. 13:1D-158. The plain language of the EJLaw's "stressor" definition in that statute identifies two broad categories: "sources of environmental pollution" and "conditions that may cause potential public health impacts." While that definition provides an illustrative but non-exhaustive list for the former, it only names disease examples and not examples of "conditions" for the latter, providing only examples of potential public health impacts. Indeed, by using the phrase "but not limited to," the Legislature adopted an open-ended definition of both facility and public health

A-2936-22

impacts. The Legislature intended the list to be "illustrative rather than exhaustive." Sanchez v. Fitness Factory Edgewater, LLC, 242 N.J. 252, 265 (2020).

In its responses to comments, DEP stated that it

> differentiates between stressors that "may cause potential health impacts," which refer to indicators of indirect environmental and public health impacts, often referred to as "quality-of-life" impacts and stressors that are considered "baseline" or "affected." . . . These "quality-of-life" stressors are relevant to the consideration of permit applications because they can put a strain on a community's resources and make future environmental and public health threats more difficult to prevent or manage. Not including these stressors would underrepresent the stresses placed on these communities, and the goal of the E[JLaw] is to ensure that these communities are not further burdened by additional pollution sources.

[55 N.J.R. at 707.]

Thus, the EJLaw does not prevent DEP from considering "quality of life" stressors.

Appellants also allege DEP does not have the expertise to identify and measure social justice issues or adverse public health impacts.

Contrary to appellants' contention, the Legislature has recognized DEP's expertise in public health issues as it relates to the environment. "With matters that affect public health, we have readily implied [DEP has] such powers as are necessary to effectuate the legislative intent." Adoption of N.J.A.C. 7:26B,

59

128 N.J. at 450. In fact, DEP's "core missions [are] to maintain, protect, and enhance New Jersey's natural resources and to protect the public health, safety, and welfare, and the environment." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 111 (App. Div. 2013) (quoting N.J.A.C. 7:1B-1.1 and N.J.A.C. 7:1B-2.2(a)(6)). See N.J.S.A. 13:1D-7(a) (designating DEP as a public health agency). Thus, DEP does not lack the statutory authority or expertise to consider "quality of life" stressors.

Appellants also contend that DEP's identification of and methods of measuring the quality-of-life stressors are arbitrary and capricious.

In its responses to comments, DEP explained that the stressors selected

> are not intended to be directly attributable to facility operations. Rather, they are intended to inform the specific categories set forth in the [EJLaw]'s definition of environmental and public health stressors and provide a baseline of information to support the required comparative analysis. In this way, each stressor was selected to capture different aspects of how pollution sources impact those communities. Some stressors show the potential correlation to air or water standard violations, while others show indirect impacts of these sources on a community. The [DEP] has . . . selected the appropriate and minimum number of stressors necessary to provide a complete and accurate view of the stresses placed on [OBCs] and form the basis of an analysis geared toward reducing disproportionate impacts on the environment and health of members of these communities.
>
> [55 N.J.R. at 705.]

DEP further explained that it had to account for "conditions that may cause potential public health impacts" and therefore included the "[c]ount of community drinking water violations or exceedances," potential lead exposure, lack of tree canopy, and lack of recreational open space. Ibid. Indeed, there is factual evidence presented in the record, which includes citations to various articles, studies, reports and websites, to reasonably support the stressors chosen by DEP and show that "[t]hese 'quality-of-life' stressors are relevant to the consideration of permit applications because they can put a strain on a community's resources and make future environmental and public health threats more difficult to prevent or manage." 55 N.J.R. at 707. Specifically, the factual basis for inclusion of each stressor and the specific statutory criteria which it is intended to inform, including whether the stressor is one that correlates with public health impacts, is discussed in detail in the notice of proposal, 54 N.J.R. at 974-82. Appellants do not challenge the specific factual basis for any "quality of life" stressor.

ISRI argues that including the "mere existence" of solid waste and scrap metal facilities as a separate stressor is invalid and results in impermissible "double-counting."

But it is the EJLaw that specifies such facilities are stressors themselves. N.J.S.A. 13:1D-158 defines "environmental or public health stressors" as

A-2936-22

"sources of environmental pollution, including, but not limited to, concentrated areas of air pollution, mobile sources of air pollution, contaminated sites, transfer stations or other solid waste facilities, recycling facilities, scrap yards, and point-sources of water pollution . . . ."  (Emphasis added).  Thus, it is not unreasonable, arbitrary or capricious for DEP to include them expressly in its twenty-six stressors.

Indeed, in response to ISRI's similar public comments, DEP stated that "the Legislature designated certain stressors, like scrap metal facilities, as both a facility type that triggers environmental justice review and as an environmental and public health stressor" and "otherwise gave substantial deference to the [DEP] to define specific data points to inform the broad stressor categories identified in the [EJLaw]."  55 N.J.R. at 706.  DEP further explained that "[t]he inclusion of these facilities in [the EJLaw's] definition serves as a clear recognition by the Legislature that the presence of these facilities, particularly when located in abundance due to historic siting inequities, constitutes a source of environmental stress on a community."  55 N.J.R. at 705.  Indeed, by specifying particular facilities as examples of "sources of environmental pollution" alongside other categories, such as "concentrated areas of air pollution" and "point-sources of water pollution,"

A-2936-22

the Legislature intended that a solid waste and scrap metal facility's impacts should be considered separate from, and additional to, its presence.

We also are unconvinced by appellants' contentions that the EJLaw and the EJRules impermissibly preempt municipal regulation under the Municipal Land Use Law (MLUL).

In Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255, 271 (1997), the Supreme Court stated:

> In the modern administrative state, regulation is frequently complementary, overlapping, and comprehensive. Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation. It is not readily to be inferred that the Legislature, by enacting multiple remedial statutes designed to augment protection, actually intended that parties be subject only to one source of regulation.

As we have discussed, the EJLaw essentially overlays a regulatory process on top of preexisting permitting programs enforced by DEP and local municipalities. The principal means by which regulatory authority is exercised under the EJLaw is by requiring a permit or approval to be obtained from the DEP before certain types of development or uses in overburdened communities may be undertaken in order to ensure that the environmental and health impacts of the State's continued economic progress are no longer borne

disproportionately by residents of those communities. Thus, there is no regulation of local zoning concerns or preemption of the MLUL's intent. See Borough of Avalon v. N.J. Dep't of Env't Prot., 403 N.J. Super. 590, 601 (App. Div. 2008) (invalidating DEP's public access rules, but stating "even though CAFRA delegates authority to the DEP to regulate certain land uses within the coastal zone, it does not preempt municipal regulation under the Municipal Land Use Law").

In sum, DEP did not exceed its authority and reasonably interpreted the EJLaw's provisions for assessing the effects of localized pollution and public health impacts of OBC's by identifying reasonable environmental and public health stressors for analysis.

VII.

The EJMAP and Technical Guidance Document

Appellants assert that the APA requires DEP to issue the EJMAP and its Technical Guidance document through formal rulemaking procedures, N.J.S.A. 52:14B-1 to -27, rather than release them as guidance documents. We disagree.

"The purpose of the APA rulemaking procedures is 'to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they

may not have anticipated.'"  In re Provision of Basic Generation Serv., 205 N.J. 339, 349 (2011) (quoting In re Adoption of 2003 Low Income Hous. Tax Credit Qualified Allocation Plan, 369 N.J. Super. 2, 43 (App. Div. 2004)).

In assessing claims that a particular agency action must go through formal notice-and-comment rulemaking, a court poses two questions:  (1) whether any of the APA's statutory rulemaking exceptions apply; and (2) if no exception applies, whether the factors in Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313 (1984), require rulemaking.  If an exception applies, the inquiry ends.  Woodland Priv. Study Grp. v. State, Dep't of Env't Prot., 109 N.J. 62, 66, 68-69 (1987).

As to the exceptions, the APA allows administrative agencies to issue "regulatory guidance document[s]" exempted from formal rulemaking if certain conditions are met.  N.J.S.A. 52:14B-3a(c).  A "regulatory guidance document" is defined as "any policy memorandum or other similar document used by a State agency to provide technical or regulatory assistance or direction to the regulated community to facilitate compliance with State or federal law or a rule adopted pursuant to [the APA] . . . ."  N.J.S.A. 52:14B-3a(d).  A document meeting that definition need not undergo formal rulemaking so long as:  (1) the agency makes the document "readily available to the regulated community . . . including . . . posting . . . on the [agency's]

website . . . ."; (2) the document does not "impose any new or additional requirements" that are not in the "law or rule that the regulatory guidance document is intended to clarify or explain . . . ."; and (3) the agency does not use it "as a substitute for the . . . law or rule for enforcement purposes." N.J.S.A. 52:14B-3a(b) and (c)(1)-(2).

By contrast, "[i]f an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." Airwork Serv. Div., a Div. of Pac. Airmotive Corp. v. Dir., Div. of Tax'n, 97 N.J. 290, 300 (1984). The APA defines "administrative rule" or "rule" as "each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." N.J.S.A. 52:14B-2.

The EJMAP and its Technical Guidance depict the twenty-six stressors and translate publicly available data from its original format to a final geospatial layer available for internet download and open source. 55 N.J.R. at 708. In creating the EJMAP and its Technical Guidance document, DEP stated that its

> goal was to provide information on the publicly available data and an overarching summary of the methods and tools used to analyze that data and present it in a similar format and at the block group

A-2936-22

level for comparison. The Technical Guidance was not designed as an instructional manual and assumes users have a basic understanding of standard GIS geospatial tools that are readily available and commonly used in these types of analyses. The Technical Guidance does provide links to these standard tools for those that might need additional information on their purpose and use.

[55 N.J.R. at 711.]

When commenters questioned DEP's creation of the EJMAP and Technical Guidance document without formal rulemaking, DEP responded:

The [DEP] created the EJMAP tool to provide a publicly available, user-friendly, visual representation of the underlying data to allow applicants easy access to the information without the burden of having to conduct the analysis themselves. It does not impose any new requirements on the regulated community that are not included in the proposed rulemaking. . . . Given this, the EJMAP tool is not part of the formal EJ rule proposal for [APA] purposes, but rather allows the [DEP] to keep its underlying data current and address or clarify issues within the methodology calculations.

[55 N.J.R. at 714.]

Formal rulemaking was not required for the EJMAP and its Technical Document. The EJLaw authorizes DEP in N.J.S.A. 13:1D-161(b) to "issue a technical guidance" which it "shall publish on its Internet website" immediately after, and separate from, instructing DEP to engage in rulemaking in N.J.S.A. 13:1D-161(b).

Furthermore, both the EJMAP and Technical Guidance meet the requirements for an APA exception as they are publicly available online and assist the regulated community "to facilitate" and aid compliance, but do not themselves impose any "requirements" or standards that the regulated entities must follow. N.J.S.A. 52:14B-3a(d). The resources perform informational functions only. That is, if an applicant wishes to access a geographic OBC or covered facilities presentation or access stressor totals data, they can consult the EJMAP and its Technical Guidance. On the other hand, if an applicant would rather conduct the analyses themselves, they can obtain relevant data from DEP in a separate format. N.J.A.C. 7:1C-2.3(a). Because formal rulemaking was not required for the EJMAP and its Technical Guidance document, we need not undergo a Metromedia analysis. The two resources do not prescribe procedures, agency policies, or directives that are not otherwise expressly provided in the EJLaw, and they do not reflect any administrative policy or interpret any law or general policy.

VIII.

Impact Statements

ISRI contends DEP failed to conduct and present adequate impact analyses on the proposed EJRules, as required under the APA. It argues that DEP presented only cursory socio-economic and jobs impact statements that

are devoid of meaningful analysis or information, which therefore render the EJRules invalid.

The APA requires an agency to provide the following impact statements in its rulemaking proposal: (1) a description of the expected socio-economic impact of the rule; (2) a regulatory flexibility analysis; (3) "a jobs impact statement which shall include an assessment of the number of jobs to be generated or lost if the proposed rule takes effect"; (4) an agriculture industry impact statement; (5) a housing affordability impact statement (6) a smart growth development impact statement; and (7) a racial and ethnic community criminal justice and public safety impact statement. N.J.S.A. 52:14B-4(a)(2). N.J.A.C. 1:30-5.1(c)(2) through (10) detail what each impact statement must address.

"The essential purpose" of impact statements "is to provide interested parties with notice of the impacts anticipated by the agency proposing the rule." In re Adoption of N.J.A.C. 5:96 & 5:97, 416 N.J. Super. 462, 507-08 (App. Div. 2010), aff'd as modified on other grounds, 215 N.J. 578 (2013). "Such notice affords interested parties the opportunity to participate meaningfully in the rule-making process and to 'inform[] regulators of possibly unanticipated dimensions of a contemplated rule.'" Id. at 507 (quoting In re

Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 365 (App. Div. 2002)).

DEP included all of the requisite impact statements in its EJRules proposal in substantial compliance with the APA. See 54 N.J.R. at 987-90. Furthermore, the public comments confirm that the regulated community was informed about the possible unanticipated dimensions of the proposed EJRules.

For example, DEP stated in its jobs impact statement that it expected the new rules would "have little or no impact on job retention in the State and in [OBCs]," but that reducing environmental and public health stressors "is likely to improve economic activity" and "improve employment outcomes" in OBCs. 54 N.J.R. at 989. DEP also acknowledged that facilities may "offset compliance costs by hiring fewer workers or limiting expansion" but it stated that "in the long run, continuing improvements in technology will drive down mitigation costs at these facilities." Ibid.

Pursuant to N.J.A.C. 1:30-5.1(c)(5), the jobs impact statement "shall include an assessment of the number of jobs to be generated or lost if the proposed rule takes effect." DEP substantially complied with that rule here because it assessed the jobs outlook from the EJRules by acknowledging potential job loss and potential job creation. Neither the rule nor the APA

require an agency to quantify the expected number of jobs to be generated or lost or require a formal cost-benefit analysis.

ISRI also challenges the socio-economic impact analysis because DEP does not fully estimate the costs and does not even anticipate how many facilities will not be constructed due to the EJRules.

In its economic impact statement, DEP stated that reducing environmental and public health stressors in OBCs "will reduce health care costs throughout the State" and "spur[] economic revitalization" in OBCs. 54 N.J.R. at 988. DEP also provided details for expected human health improvements and increased property values and incomes. 54 N.J.R. 988-89. As to anticipated costs for regulatory compliance, DEP stated that any "additional capital, operating, and/or regulatory expenses" facilities might incur to comply with the new EJRules "will be offset by the increased economic health of the host [OBC]." 54 N.J.R. at 988. DEP acknowledged that it "cannot fully estimate" the costs each facility will incur due to numerous facility-specific details.

Pursuant to N.J.A.C. 1:30-5.1(c)(3), the economic impact statement shall "describe[] the expected costs, revenues, and other economic impact upon governmental bodies of the State, and particularly any segments of the public proposed to be regulated." DEP substantially complied with that rule here

71

because it thoroughly described the expected economic impact of the proposed amendments, including potential negative impacts. Neither the rule nor the APA require an agency to provide specific cost information or quantify the expected costs and revenues generated or lost. "All that is required is for the agency to describe the expected economic impact." In re Adoption of Rules Regarding Prop. Disposition of Casino Licensee, 224 N.J. Super. 316, 324 (App. Div. 1988).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2936-22